UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

SASHA SLOAN Plaintiff

v. Civil Action No. 3:25-cv-275-RGJ

LOUISVILLE-JEFFERSON COUNTY METRO GOVERNMENT, ET AL. Defendants

* * * * *

**MEMORANDUM OPINION AND ORDER**

Plaintiff Sasha Sloan ("Sloan") sued Louisville-Jefferson County Metro Government ("LJCMG"), Lt. Col. Jerry Collins ("Collins"), Officer Robert "Bobby" Dukes ("Dukes"), CHS TX, INC., d/b/a YESCARE ("YESCARE"), Mutuel Walka ("Walka"), Bynisha Robertson ("Robertson"), and Malisica Brunner ("Brunner") (collectively, "Defendants") for constitutional violations that allegedly occurred during Sloan's time in custody at the Louisville Metro Department of Corrections ("LMDC"), a correctional facility maintained by LJCMG. LJCMG, Collins, and Dukes (collectively, "Moving Defendants") move to dismiss Sloan's Amended Complaint under Fed. R. Civ. P. 12(b)(5) and (6). [DE 1-1 at 161–200, DE 17].[1] Sloan responded and Moving Defendants replied. [DE 20, 25]. Briefing is complete, and the matter is ripe. For the reasons below, the Court **GRANTS IN PART AND DENIES IN PART** Moving Defendants' Motion to Dismiss [DE 17].

[1] Defendants YESCARE, Walka, Robertson, and Brunner, have answered [DE 4] Sloan's Amended Complaint and have not moved to dismiss Sloan's claims asserted against them in Counts 6 and 7 of the Amended Complaint.

## I. BACKGROUND

Sloan filed her original complaint in Jefferson Circuit Court on April 22, 2025. [DE 7-1 at 383; DE 7-2]. The next day—April 23, 2025—she filed an Amended Complaint as a matter of course under Kentucky Rule of Civil Procedure 15.01. [DE 1-1 at 163; DE 7-3]. The Amended Complaint alleges that Sloan is HIV positive and was denied necessary medical care while in custody at LMDC, causing her health to deteriorate. [DE 1-1 at 170–99].

From those allegations, Sloan asserts claims against seven defendants involved in LMDC, including the Moving Defendants. [*Id.* at 161–63]. She states the following causes of action: a 42 U.S.C. § 1983 (hereinafter "§ 1983") *Monell* claim against LJCMG (Count I); a § 1983 violation for deliberate indifference under the Eighth and Fourteenth Amendments against Dukes and Collins (Count II); a § 1983 *Monell* claim for failure to train and supervise against LJCMG and Collins (Count III); common law negligent supervision and training under Kentucky state law against Collins (Count IV); common law negligence under Kentucky state law against Collins and Dukes (Count V); a § 1983 violation under the Fourteenth Amendment Due Process Clause against Moving Defendants, YESCARE, Walka, Robertson, and Brunner for denying her HIV medication (Count VI); a § 1983 violation under the Eighth Amendment against Moving Defendants, YESCARE, Walka, Robertson, and Brunner for denying her HIV medication (Count VII); a § 1983 violation under the Eighth Amendment against Dukes specifically for "punish[ing] [Sloan] for being a carrier of the virus that causes AIDS" (Count VIII); a § 1983 violation under the Fourteenth Amendment Equal Protection Clause against Dukes for treating Sloan differently than other inmates (Count IX); a § 1983 violation under the Fourteenth Amendment Due Process Clause against Dukes (Count X); a § 1983 violation under the Eighth Amendment against Dukes, Collins, and LJCMG for "unwarranted disclosure of her HIV status to the other inmates" (Count XI); a

§ 1983 violation under the Eighth Amendment against Dukes for cruel and unusual punishment (Count XII); and a § 1983 violation under the Fourteenth Amendment Due Process Clause against Dukes for violating her right to privacy (Count XIII). [DE 1-1 at 170–99].

All claims contained in the Amended Complaint arise from Sloan's time in custody at LMDC, a correctional facility maintained by Defendant LJCMG. [*Id.* at 164–65, 172–73]. According to the Amended Complaint,[2] on April 22, 2024, Sloan was arrested by probation and parole for an outstanding bench warrant and transported to LMDC at 400 South Sixth Street in Louisville, Kentucky. [*Id.* at 166].[3] During booking, Sloan informed the nurses and other LMDC staff that she was HIV-positive, needed her medication, and requested to see a doctor given her prior experiences not receiving her prescribed HIV medication while in LMDC custody. [*Id.* at 168–69].[4]

Sloan completed medical forms and made "many requests" to LMDC's nurses for her HIV medications and to see a doctor between April 22, 2024, and April 25, 2024. [*Id.* at 169]. Sloan alleges that she did not receive responses to any of her requests. [*Id.*]. On or about April 24, 2024, before being transferred to court for an appearance, a nurse at LMDC asked to speak with Sloan. During that conversation, Sloan "began filling out and turning in many grievances," concerning

---

[2] Unless otherwise stated, all facts referenced in the subject order are taken from Sloan's Amended Complaint and are alleged.

[3] Sloan was charged with receiving stolen property and theft by unlawful taking or disposition in 2023. [*Id.* at 165]. The bench warrant resulted from her failure to appear in Jefferson County District Court related to that arrest and violating the conditions of her release. [*Id.* at 168].

[4] Sloan was previously in LMDC custody in late 2023 and alleges that she did not receive her HIV medication during that incarceration. [*Id.*]. As discussed below, this alleged conduct falls outside the statute of limitations and will not be considered in the Court's analysis.
Additionally, Sloan identifies named Defendant CHS TX, Inc., d/b/a: YESCARE ("YESCARE"), as the entity "[a]t all times relevant to [her] Complaint . . . contracted to provide health care services to patients located at LMDC." [DE 1-1 at 166]. Based on Sloan's allegation that YESCARE was contracted to provide all medical care to LMDC detainees, the Court will assume that she is referring to YESCARE employees when she discusses unidentified LMDC nurses.

"being assigned the name card 'Elizabeth Sloan', her request for medical forms, her request to see a doctor, [and] her request for her HIV medications." [*Id.* at 169–70]. The following morning, on or about April 25, 2024, a nurse at LMDC again asked to speak with Sloan and discussed Sloan's request for her HIV medication and to see a doctor. [*Id.* at 170]. Sloan completed another medical form at the nurse's request. [*Id.*]. From April 25, 2024 until August 2024, Sloan asked LMDC shift nurses, officers, and other employees about her request for HIV medication and to see a doctor "concerning her health declining from not receiving her HIV medication." [*Id.*]. The LMDC nurse indicated each time that "LMDC[] staff will call her when it is her turn or that she will know when she will be called, when she is called, or words to that effect." [*Id.* at 171].

While in LMDC custody, Sloan interacted with Dukes, a correctional officer employed by LJCMG. [*Id.* at 165]. Dukes frequently came to the door of the inmate's dorm and asked if they wanted to go to the gym. [*Id.* at 175]. The gym offered inmates various resources, including "a basketball court, exercise room, and accessories such as hair clippers, and nail clippers that are accompanied with biohazard sanitary supplies." [*Id.*].

One day in late April or May 2024, while Sloan was using the gym equipment, Dukes "singled [her] out" by calling her name in front of other inmates and "requesting her to come to him." [*Id.*]. During their conversation, Dukes asked her out loud, "Do you have AIDS?" [*Id.*]. When Sloan replied no, Dukes said that "because you have HIV, you cannot use any clippers until you get cleared by medical" and that she needed permission from medical "to use any of the equipment." [*Id.* at 176]. Sloan alleges that Dukes, in effect, "had disclosed her HIV status to the other inmates in the gym." [*Id.*]. Dukes made the statements again to Sloan while escorting inmates back to the dorm, this time "in front of at least ten (10) inmates and several other individuals." [*Id.*]. Sloan alleges that Dukes singled her out because of her race and HIV status. [*Id.* at 181–82].

As a result of Dukes's disclosure, Sloan alleges that other inmates started targeting her because of her HIV-positive status. [*Id.* at 176]. After returning to the dorm, "the inmates began chanting out loud 'AIDS having bitch!'; 'No body wants to be in the dorm with her'; 'We can catch AIDS from this AIDS having dirty bitch!'; 'She is in here with us with that shit!' and 'Nobody is even treating her so we can now get AIDS!'" [*Id.*]. The inmates also threatened to "beat her down" and to "make her stay in the corner of the dorm and sleep on the floor" to "ensure that she does not come near any bed in the dorm." [*Id.*]. On one occasion, the inmates "began pressing the panic button calling for medical attention" because Sloan was visibly experiencing HIV symptoms as a result of not taking her medication, including "throwing up blood, coughing, while sweating in her sleep, having a fever, cold chills, rashes, no appetite, body-aches, flu symptoms, and diarrhea." [*Id.*]. Sloan informed staff that "she was being threaten[ed] with being physically beaten up and placed in a corner of the room away from everyone" by the other inmates, "was unable to sleep from feeling shameful" about the disclosure of her HIV-positive status, and that she had concerns about her safety as a result of the aforementioned threats. [*Id.* at 177]. Sloan requested to be removed from the dorm and placed in a single cell. [*Id.*]. According to the Amended Complaint, staff would respond by saying "'Sloan deal with it', or words to that effect." [*Id.*].

Sloan further alleges that the inmates followed through on their threats. [*Id.*]. They took Sloan's mattress, forced her to sleep on the floor in the corner of the dorm, prevented her from eating, and "made her remain in the corner" to ensure that she was not near anyone. [*Id.*]. Sloan again informed staff of the situation and her inability to protect herself from the other inmates. [*Id.*].

On May 1, 2024, Sloan requested "HIV medications, protection from the inmates, extra meals, and a mattress" from LMDC officials. [*Id.*]. Between May 5, 2024 and May 18, 2024, Sloan

spoke with several medical providers about being HIV-positive, not being on her prescribed medication despite repeatedly requesting it, and needing to see a doctor. [*Id.* at 178]. She also informed staff that "she was suffering from fever, night sweats, loss of weight, shortness of breath, productive cough with yellow phlegm, and chest pain." [*Id.*].

When Sloan went to court for a hearing in her criminal case on May 23, 2024, she informed the court of her "failing health due to her not being given her HIV medication." [*Id.* at 179]. The following day when the court entered its judgement, it "mandated that Ms. Sloan be transferred to a Kentucky Department of Corrections ["KDOC"] medical facility to address her HIV diagnosis and mandatory treatment, or for LMDC medical staff to address the issue if a transfer was not immediate." [*Id.*]. Thereafter, Sloan repeatedly requested a transfer and was "ignored" by LMDC officials and staff. [*Id.*]. In June 2024, Sloan suffered from "trouble swallowing, thrush, and vaginal yeast infections" because of not receiving her HIV medication. [*Id.*]. Around this time, Sloan began asking KDOC to transfer her to a facility that could meet her medical needs. [*Id.* at 179–80]. Sloan received a response, "explaining that transfers between jails, such as the LMDC, are handled by the jailer (such as the LMDC) and suggested that she contact the LMDC to make her request." [*Id.* at 180].

In early August 2024 Sloan's criminal defense attorney moved for shock probation arguing that "Sloan had not received her HIV medication while incarcerated despite a court order, and that shock probation would allow her to access necessary medical treatment." [*Id.*]. The commonwealth did not oppose the motion, on the condition that Sloan be placed on HIP for 90 days at a medical treatment facility. [*Id.*]. The court granted Sloan's motion, and she was "placed on unsupervised shock probation for three (3) years, with conditions including good behavior, no weapons, no

controlled substances without a prescription, full-time employment or school attendance, and 90 days on HIP at a treatment facility with necessary releases." [*Id.* at 181].

Sloan alleges in her Amended Complaint that "almost everyday" from April 24, 2024, to August 2024, she "kept inquiring and requesting" updates about her filed grievance and the appeals process from LMDC officers and employees but was either ignored, "informed that her grievance will not be heard, entertained, nor considered," or "denied any and all information." [*Id.*]. During this time, Sloan complied with "all" LMDC officers' orders. [*Id.* at 182]. It is further alleged that "no other detainees . . . at the LMDC facility [were] subjected to the same restrictions that were levied upon Ms. Sloan." [*Id.*]. Finally, Sloan alleges that "at all time[s] relevant" to her Amended Complaint, Moving Defendants were "acting pursuant to, and in conformity with, LMDC policies and customs related to providing untimely medical treatment for patients." [*Id.*]. She asserts that these specific policies caused the severe and unreasonable delay in addressing her medical needs. [*Id.*]. Sloan also alleges that YESCARE "maintained the policies and practices which caused [her] to receive wholly inadequate and untimely medical care." [DE 1-1 at 166].

Sloan alleges that she has suffered physical and mental anguish as a result of her time at LMDC. [*Id.*]. She asserts insomnia, extreme humiliation, embarrassment, a loss of enjoyment of life, and alienation, as well permanent physical damage to her health that she continues to struggle with. [*Id.*]. Most notably, she alleges Defendants' failure to provide her with "adequate and timely medical treatment" led her T-cell count to drop below 300 during her incarceration. [*Id.* at 183]. This drop triggered complications that eventually led to her being diagnosed with AIDS, an outcome she asserts would have been prevented had the Defendants provided proper medical care. [*Id.*]. Consequently, she alleges the delay in medical care led Sloan to "unnecessary pain and suffering," exacerbating her injuries to the point that she is "legally deemed disabled." [*Id.*].

Sloan initiated this action by filing her original complaint in the Jefferson Circuit Court on April 22, 2025. [DE 7-1 at 383; DE 7-2]. The following day she filed an Amended Complaint as a matter of course under Kentucky Rule of Civil Procedure (KRCP) 15.01. [DE 1-1 at 163; DE 7-3].[5] On May 14, 2025, Moving Defendants removed this case to federal court, [DE 1], and, on May 21, 2025, filed a motion for a more definite statement under FRCP 12(e). [DE 6]. The Moving Defendants argued that Sloan filed a second Amended Complaint on April 25, 2025 in Jefferson Circuit without leave from the court or consent from Defendants, which is required by the Kentucky Rules of Civil Procedure. [DE 6 at 368–69]. The Moving Defendants claimed that it was unclear "which of the two Amended Complaints function[ed] as the operative pleading" and therefore they could not prepare a response to the complaint. [*Id.* at 369].

Sloan countered that she did not file a second Amended Complaint; rather a duplicate copy of the April 23 Amended Complaint "was entered in the . . . state court's record on April 25, 2025." [DE 7 at 373]. Because no second amendment existed, she maintained that the operative pleading was unambiguous and a more definite statement was unnecessary. [*Id.*]. In early February 2026, this Court denied Moving Defendants' motion for a more definite statement, finding that the operative complaint in this case is the Amended Complaint filed on April 23, 2025. [DE 15 at 713]. The Moving Defendants subsequently moved to dismiss Sloan's Amended Complaint for (1) insufficient service of process, and (2) failure to state a claim upon which relief may be granted. [DE 17].

[5] Sloan attached a 2022 investigative report commissioned by LJCMG (the "GAR Report" or "report") to her Amended Complaint in support of her claims. [*Id.* at 186]. The report found systemic "poor policy, training and supervision" of LMDC correctional officers and delays in initial medical screenings. [*Id.*].

## II. DISCUSSION

### a. Improper Service of Process

#### *1. Standard*

Federal Rule of Civil Procedure 12(b)(5) provides that the Court may dismiss an action for "insufficient service of process." Fed. R. Civ. P. 12(b)(5). A plaintiff "bears the burden of perfecting service of process and showing that proper service was made." *Sawyer v. Lexington–Fayette Urb. Cnty. Gov't*, 18 F. App'x 285, 287 (6th Cir. 2001) (citing *Byrd v. Stone*, 94 F.3d 217, 219 (6th Cir. 1996)). "In considering a motion to dismiss, pursuant to Rule 12(b)(5), [the] Court must accept as true all well pleaded allegations of the complaint, although reference to the record is permissible to determine the alleged insufficiency of service of process." *Paluso v. Perdue*, No. 5:17-CV-00169-TBR, 2019 WL 2479658, at *4 (W.D. Ky. June 12, 2019) (quoting *Thompson v. Kerr*, 555 F. Supp. 1090, 1093 (S.D. Ohio, 1982)). "Although outright dismissal is permitted under Rule[] . . . 12(b)(5), dismissal on [this basis] is not always warranted, and the district court has broad discretion in deciding whether to dismiss a complaint on the ground of improper service." *Est. of Isham v. Richardson*, No. 3:24-CV-142, 2025 WL 2772460, at *2 (S.D. Ohio Sept. 26, 2025), *recons. denied*, No. 3:24-CV-142, 2025 WL 3214348 (S.D. Ohio Nov. 18, 2025) (citation modified) (citing *Kalasho v. Republic of Iraq*, 102 F. App'x 27, 28 (6th Cir. 2004). Generally, "[d]efects in the service of process . . . require granting leave to attempt valid service rather than dismissal." *Tran v. Mich. Dep't of Hum. Servs.*, No. 07-CV-13232, 2008 WL 2513862, at *3 (E.D. Mich. June 19, 2008) (citing *Frederick v. Hydro-Aluminum S.A.*, 153 F.R.D. 120, 123 (E.D. Mich. 1994)); *Smith v. Kentucky Fried Chicken*, No. CIV.A. 06-426-JBC, 2007 WL 162831, at *3 (E.D. Ky. Jan. 18, 2007) (explaining that, while the court may dismiss a case for insufficient service,

"the better practice is to quash insufficient service of process unless it is clear that the plaintiff cannot effect proper service").

In cases that are removed from state court, "[f]ailure to comply with state service-of-process rules can result in the dismissal of removed cases." *Smith v. Parks*, No. CIV.A. 5:14-260-KKC, 2015 WL 770337, at *1 (E.D. Ky. Feb. 23, 2015) (citing *Bates v. Harp*, 573 F.2d 930, 933–34 (6th Cir. 1978)). "In determining the validity of service in the state court prior to removal, a federal court must apply the law of the state under which the service was made." 4A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1082 (2d ed. 1987). After removal, federal law controls, and defects in service that occurred prior to removal can be cured or waived in accordance with the Federal Rules of Civil Procedure. Fed. R. Civ. P. 81(c)(1) ("These rules apply to a civil action after it is removed from a state court."); 28 U.S.C. § 1448 ("In all cases removed from any State court to any district court of the United States in which . . . the service has not been perfected prior to removal, . . . such process or service may be completed or new process issued in the same manner as in cases originally filed in such district court."); *Powell v. Harris*, No. 3:11-CV-603, 2013 WL 2896827, at *1 (W.D. Ky. June 12, 2013) ("Under Rule 12(h)(1), a party waives the defense of service of process by filing a motion to dismiss that does not raise that defense, failing to file a motion to dismiss, or failing to raise the defense in a responsive pleading."). Accordingly, the Court considers, regardless of whether service was defective under Kentucky law, if Sloan cured or Moving Defendants waived any alleged defects in service under the Federal Rules.

***2. Analysis***

Moving Defendants argue that all claims against them must be dismissed because Sloan failed to properly serve them with the Amended Complaint under Kentucky service rules. [DE 17].

Sloan counters that the amended and original complaints were properly served on Defendants. [DE 20]. And—even if there had been a procedural defect in service—Moving Defendants permanently and irrevocably waived the service defense by failing to include it in their initial Rule 12 motion for a more definite statement. [*Id.*].

Service of process is a threshold jurisdictional requirement; a court lacks jurisdiction over a named defendant who has not been properly served. *King v. Taylor*, 694 F.3d 650, 655 (6th Cir. 2012). However, objections to service of process are subject to waiver. *Id.* at 656. Rule 12(b) requires that a motion asserting insufficient service of process under Rule 12(b)(5) "must be made before pleading if a responsive pleading is allowed." Fed. R. Civ. P. 12(b). Under Rule 12(h)(1)(B), a party waives this defense if they fail to raise it in either a pre-answer Rule 12 motion or their responsive pleading. *See* Fed. R. Civ. P. 12(h)(1)(B); *King*, 694 F.3d at 657. While a defendant generally enjoys the option to preserve the defense in either manner, that option terminates if they file a prior Rule 12 motion that omits the defense. *King*, 694 F.3d at 657. By operation of the Federal Rules, a defendant who files a Rule 12 motion but fails to raise an available insufficient service defense forever waives that objection. *Id.* at 656 (citing Fed. R. Civ. P. 12(b)(5), (g)(2), (h)(1)(A)).

Yet waiver applies only to defenses available at the time of a defendant's response. *Boulger v. Woods*, 917 F.3d 471, 476–77 (6th Cir. 2019) ("A defendant cannot be deemed to have waived defenses, however, that 'were not . . . available at the time they could first have been made.'" (quoting *Holzsager v. Valley Hosp.*, 646 F.2d 792, 796 (2d Cir. 1981)). For instance, an insufficient service defense is unavailable—and thus not waived—if a defendant files their first Rule 12 motion before the applicable service deadline expires. *Id.* In *Boulger*, the defendant did not waive his

insufficient service defense by omitting it from a motion for judgement on the pleadings filed two months before the service deadline, when the defense was not yet available. *Id.*

Here, Moving Defendants did make a Rule 12 motion when they filed a motion for more definite statement under Fed. R. Civ. P. 12(e) arguing that "it [was] unclear which amended complaint produced by [Sloan] function[ed] as the operative pleading." [DE 6 at 369]. Moving Defendants' motion for more definite statement did not raise a challenge to insufficient service of process, a defense listed under Fed. R. Civ. P. 12(b)(5). [DE 6]. This was their first Rule 12 motion, and notably—they did not discuss this Court's jurisdiction or service of process. [*Id.*]. Because they failed to raise the defense of insufficient service of process, they waived that defense. *See W. Bend Mut. Ins. Co. v. Osmic, Inc.*, No. 1:21-CV-00593-PAB, 2023 WL 6258796, at *8 (N.D. Ohio Sept. 26, 2023) (finding that defendant waived her insufficient service of process defense by failing to raise it in her first Rule 12 motion).

Moving Defendants' sole argument echoes their first Rule 12 motion; that they "initially were unaware of which document filed by plaintiff constituted the operative Complaint" and that "[u]pon the Court's clarification, [they] asserted the present motion" which "is a responsive pleading contemplated by Federal Rule of Civil Procedure 12." [DE 25 at 1260]. They cite no authority for this argument, which runs headfirst into the limitations imposed explicitly by the plain language of Rule 12 and appears to suggest that a motion under 12(b)(5) objecting to the sufficiency of service of process was not available to them at that stage of the litigation. This argument cannot be reconciled with Rule 12's plain text.

Rule 12(h)(1) mandates that a party "waives any defense listed in Rule 12(b)(2)–(5) by omitting it from a motion in the circumstances described in Rule 12(g)(2)." Rule 12(g)(2), in turn, dictates that a party who makes a motion under Rule 12 "must not make another motion under this

rule raising a defense or objection that was available to the party but omitted from its earlier motion."

Each textual requirement for waiver is satisfied here. Moving Defendants first moved under Rule 12(e) for a more definite statement. They then filed "another motion under" Rule 12—this time under Rule 12(b)(5)—raising insufficient service of process. And that defense was "available" when they filed their first motion. By their own admission, the Moving Defendants possessed copies of both amended complaints and were fully capable of evaluating whether either amended complaint had been properly served. Their purported uncertainty regarding which amended complaint was operative did not prevent them from raising the service defense as to both. Because the defense was available yet omitted from their first Rule 12 motion, Rule 12(h)(1) dictates that it is waived.

The timing of Moving Defendant's motion further illustrates the purpose of Rule 12's waiver provision. Significantly, the objective of Rule 12 "is to eliminate unnecessary delay at the pleading stage by requiring the defendant to advance up-front every available Rule 12 defense and objection he or she may have that is assertable by motion." *Gundaker/Jordan Am. Holdings, Inc. v. Clark*, No. CIV.A.04-226-JBC, 2009 WL 1851097, at *3 (E.D. Ky. June 26, 2009 (quoting *United States v. Islip*, 18 F.Supp.2d 1047, 1053 n.6 (Ct. Int'l Trade 1998)). Had Moving Defendants raised insufficient service in conjunction with their motion for a more definite statement, the Court could have addressed both issues together—and the resolution of the service issue might have obviated the need to address the sufficiency of the pleading at all. Instead, the parties and the Court expended time and resources litigating the motion for a more definite statement before Moving Defendants raised the service issue months later. "This is a prime example of why the Federal Rules of Civil Procedure provide for a waiver of any Rule 12(b)(2)-(5) defenses that were not

raised in the first pre-answer motion or, if no motions were filed, the first responsive pleading." *Clark*, 2009 WL 1851097, at *3. In sum, dismissal at this stage would thus produce the very inefficiency that Rule 12's waiver provision seeks to prevent.

Because the Court agrees that Moving Defendants waived this defense under Rule 12 when they failed to raise it in the motion for more definite statement, it need not address whether service was proper in the first instance.

**b. Motion to Dismiss § 1983 Claims**

Sloan brings a total of eleven claims against Moving Defendants under § 1983 (Counts I, II, III, VI, VII, VIII, IX, X, XI, XII, and XIII). Counts I, III, VI, VII, and XI assert *Monell* claims against LJCMG and/or Collins, whereas Sloan's other counts here are brought against Dukes and/or Collins, in their individual capacities (Counts II VI, VII, VIII, IX, X, XI, XII, and XIII). The Court will discuss Sloan's *Monell* claims first, and then proceed to her claims against Dukes and/or Collins, who each assert the defense of qualified immunity.

***1. Standard***

Federal Rule of Civil Procedure 8(a) requires that a complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief." A motion to dismiss under Fed. R. Civ. P. 12(b)(6) tests the legal sufficiency of the complaint. *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). This standard does not "impose

a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct].” *Twombly*, 550 U.S. at 556. Dismissal under Rule 12(b)(6) is warranted “only if it appears beyond doubt that the plaintiff can prove no set of facts in support of the claims that would entitle him or her to relief.” *Zaluski v. United Am. Healthcare Corp.*, 527 F.3d 564, 570 (6th Cir. 2008).

Because a motion to dismiss challenges the sufficiency of the pleadings, “[i]t is not the function of the court [in ruling on such a motion] to weigh evidence.” *Miller v. Currie*, 50 F.3d 373, 377 (6th Cir. 1995). Rather, to determine whether the plaintiff set forth a “plausible” claim, the Court “must construe the complaint liberally in the plaintiff’s favor and accept as true all factual allegations and permissible inferences therein.” *Gazette v. City of Pontiac*, 41 F.3d 1061, 1064 (6th Cir. 1994). However, the Court is “not bound to accept as true a legal conclusion couched as a factual allegation”; “[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.” *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). In deciding a motion to dismiss, the Court “may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant’s motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein.” *Bassett v. Nat’l Collegiate Athletic Ass’n*, 528 F.3d 426, 430 (6th Cir. 2008) (citation omitted). “A complaint will be dismissed . . . if no law supports the claims made, if the facts alleged are insufficient to state a claim, or if the face of the complaint presents an insurmountable bar to relief.” *Southfield Educ. Ass’n v. Southfield Bd. of Educ.*, 570 F. App’x 485, 487 (6th Cir. 2014) (citing *Twombly*, 550 U.S. at 561–64).

Generally, courts may consider only the factual allegations in the pleadings when deciding a motion to dismiss. *Bates v. Green Farms Condo. Ass’n*, 958 F.3d 470, 483 (6th Cir. 2020). If

matters outside the pleadings are presented on a motion to dismiss and not expressly excluded by the Court, the Court must treat the motion as a motion for summary judgment under Rule 56. Fed. R. Civ. P. 12(d); *see also Bates*, 958 F.3d at 483. There are a few exceptions, however. Courts may consider documents attached to the complaint, documents attached to the motion to dismiss "so long as they are referred to in the complaint and are central to the claims contained therein," and public records without converting the motion to dismiss to a motion for summary judgment. *Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 680–81 (6th Cir. 2011). Sloan attached a 2022 investigative report commissioned by LJCMG (the "GAR Report" or "report") to her Amended Complaint in support of her claims. [DE 1-1 at 186]. The report found systemic "poor policy, training and supervision" of LMDC correctional officers and delays in initial medical screenings. [*Id.*]. Sloan relies on those findings to support her allegation that LMDC policy or custom caused constitutional deprivations to inmates in its care and that LJCMG knew of the underlying issues. [*Id.* at 185–86]. Because the GAR Report is attached to Sloan's Amended Complaint, the Court may consider the report when deciding Moving Defendants' motions to dismiss. *Rondigo*, 641 F.3d at 680–81.

***2. Analysis***

a. <u>Monell Claims</u>

Sloan brings five separate § 1983 *Monell* claims in Counts I, III, VI, VII, and XI. All of which Moving Defendants argue should be dismissed for failure to state a claim. [DE 17 at 719]. Because these claims involve different standards, the Court addresses each separately.

*i. § 1983: Policy or Custom Against LJCMG (Counts I, VI, VII, and XI)*

Counts I, VI, VII, and XI assert § 1983 *Monell* claims alleging unconstitutional policy and custom.

1) Count I - unlawful policy or custom with regards to inadequate medical care

To state a § 1983 claim based on a municipal policy or custom, Sloan must "identify the policy, connect the policy to [LJCMG] itself and show that the particular injury was incurred because of the execution of that policy." *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993). A plaintiff generally has four ways to demonstrate an unlawful policy or custom: "[t]he plaintiff can look to (1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." *Spears v. Ruth*, 589 F.3d 249, 256 (6th Cir. 2009) (quoting *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005)).

To establish municipal liability, a plaintiff must demonstrate a direct causal link between the unlawful policy or custom and the alleged constitutional violation, proving that the municipality's deliberate conduct was the "moving force" behind the injury. *Jones v. Louisville/Jefferson Cnty. Metro Gov't*, 482 F. Supp. 3d 584, 597 (W.D. Ky. 2020) (quoting *Spears*, 589 F.3d 249 at 256). Merely showing that a policy or custom made a particular violation "likely" to occur is legally insufficient. Instead, there must be an "affirmative link" between the municipal policy and the violation; under traditional tort principles, this causal connection must be proximate, rather than a mere "but-for" cause-in-fact. *Mann v. Helmig*, 289 F. App'x 845, 850 (6th Cir. 2008) (quoting *Spell v. McDaniel*, 824 F.2d 1380, 1388 (4th Cir. 1987)). At the motion to dismiss stage, however, it is sufficient for a plaintiff to plausibly allege an unlawful policy or custom and a direct link to the resulting harm. *Daugherty v. Louisville-Jefferson Cnty. Metro Gov't*, 495 F. Supp. 3d 513, 524 (W.D. Ky. 2020) (finding plaintiffs sufficiently stated a § 1983 claim based on a

municipal policy or custom where "Plaintiffs allege[d] a specific policy of targeting African American males for traffic stops").

To prevail in this case, Sloan must prove an additional element. LJCMG here is not among the individual actors alleged to have personally denied Sloan medical care; rather, her immediate custodians were personnel from the LMDC and its third-party medical provider, YESCARE.[6] Because "a municipality cannot be held liable under § 1983 on a respondeat superior theory," LJCMG may be held liable only if Sloan's injuries resulted from an unconstitutional policy or custom of the government entity. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *Ford*, 535 F.3d at 495; *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994).

The Amended Complaint identifies LMDC and YESCARE as specific sources of policies or customs, designed by LJCMG, that contributed to Sloan's constitutional deprivations. [DE 1-1 at 166, 183]. Taken as true the alleged facts allow the Court to reasonably infer a pattern or practice of inadequate medical care. [*Id.* at 172–74, 178–81]. Specifically, Sloan alleges that she repeatedly informed LMDC personnel (specifically, correctional law enforcement officers "and/or their supervisors/agents and/or other employees of . . . LMDC") that she was HIV-positive and required her medication, received "severely[,] . . . unreasonably delayed[,] inadequate medical treatment," was "ignored" by LMDC personnel when she made inquiries into treatment, and was at all times relevant to this Amended Complaint in LMDC's custody. [*Id.* at 172–74, 181, 187]. Sloan also alleges that she informed YESCARE personnel, including Defendants Walka, Robertson, and Brunner (hereinafter "Medical Provider Defendants"), and other unidentified "nurse[s]," about not being on her prescribed medication despite her requests for it, and that "YESCARE was contracted

[6] For purposes of this motion, the Court will accept that YESCARE is a "person" subject to liability under § 1983. *See West v. Atkins*, 487 U.S. 42, 56 (1988) (holding that a private medical provider contracted to provide medical care to prisoners is a state actor for purposes of § 1983).

to provide health care services to patients located at LMDC,"—including to her. [*Id.* at 166, 174, 177–78].

Sloan further alleges that her case was not an isolated incident. Rather, LJCMG should have been on notice as early as April 2013 that "LMDC was 'incredibly ill- equipped to provide adequate medical care to inmates . . . [on account of] current protocols in place.'" [*See* DE 1-1 at 184, 187 ("The Courier Journal in a February of 2013 story about allegations of substandard health care at LMDC, reported that the then-LMDC director Mark Bolton said that, '[t]he more we looked into it, the more disturbed I was getting as to some of the service delivery gaps in the health care of these individuals.'")]. And that the issues had not been addressed over ten years later. [*See* DE 1-1 at 184 ("[I]n 2023, 'in a 457-page investigation into jail deaths commissioned by Metro Council, former FBI agent David Beyer concluded LMDC was 'incredibly ill- equipped to provide adequate medical care to inmates — both from a building design and current protocols in place.'")]. Sloan also claims that LJCMG was aware of the deficiencies in medical care provided by their contractor YESCARE, who Sloan alleges was involved in previous deaths of inmates at the facility. [See DE 1-1 at 185 ("The Courier Journal in the story about the 'Company in charge of Louisville jail health care when inmates died is back, with a new name', it reported that the LJCMG's Mayor Craig Greenberg in April [of 2023] announced a search for a new health care provider for the city's jail as part of a series of "seriously needed reforms" at Metro Corrections.")]. In sum, Sloan alleges that LMDC "knowingly allowed its officers and contracted medical providers [YESCARE] to ignore its own policies against delaying inmates access to adequate medical treatment for non-medical reasons." [*Id.* at 185]. Taken as true, these factual allegations permit a reasonable inference that LMDC and YESCARE could have contributed to Sloan's

injuries by failing to treat her—despite knowing that she was HIV-positive, required medication, and faced serious health risks without it while in custody.

These overlapping, persistent alleged failures to treat a life-threatening condition are sufficient to plausibly point to an institutional custom of systemic medical neglect rather than isolated individual errors. Sloan does enough to "identify the policy, [and] connect the policy to [LJCMG] itself." *Garner*, 8 F.3d at 364. She repeatedly alleges that there is a policy or custom that led to inadequate medical care, which subsequently contributed to her deprivations, including: "[f]abricating evidence to support the . . . alleged stated reasonableness of the delay in providing adequate medical treatment," "[f]ailing to document required reports of the unreasonable delay . . . as required by LMDC policies," and "fail[ing] to properly discipline officers and medical providers . . . that . . . caused the delay." [DE 1-1 at 187]. The Amended Complaint illustrates a culture where personnel at LMDC (including YESCARE contractors) knowingly disregarded policies about inmates' access to adequate medical treatment, which could amount to "a custom of tolerance or acquiescence of federal rights violations." *Spears*, 589 F.3d at 256. Given LJCMG's position as a medical provider through LMDC and YESCARE, allowing Sloan to remain in custody for such a prolonged period without receiving adequate medical attention could demonstrate a "custom of tolerance or acquiescence of federal rights violations." *Id.* Because this

scenario is "plausible" on the face of the Amended Complaint, *Twombly*, 550 U.S. at 570, the motion to dismiss Sloan's § 1983 *Monell* claim under Count I is **DENIED**.[7]

2) Count VI - unlawful policy or custom violating Sloan's Fourteenth Amendment substantive due process right to adequate medical care

In Count VI, Sloan alleges that LJCMG violated her substantive due process right to adequate medical care under the Fourteenth Amendment because it "acted with deliberate indifference to [her] serious medical needs" by "depriv[ing] her of her right . . . to adequate medical care." [DE 1-1, 195]. In response, LJCMG argues that Count VI must be dismissed because Sloan "allege[s] actions of unconstitutional conduct committed by certain individuals[,] . . . not pursuant to a policy or custom of [LJCMG]." [*Id.* at 728].[8] Sloan replies that her Amended Complaint does "allege[] that [LJCMG's] own customs, policies, and failure to train and supervise were the 'moving force' behind the constitutional violations." [DE 20 at 772 (quoting DE 1-1 at 189)].

---

[7] Count I appears to also include allegations about excessive force within Sloan's *Monell* claim for inadequate medical care. [*See* DE 1-1 at 187–89]. But Sloan does not explain how the alleged use of force caused a delay in her medical care, and neither party otherwise addresses the relationship between the two. Defendants do not move to dismiss Count I on that ground, and the claim survives their motion on its inadequate medical care allegations. The Court therefore will not address whether the excessive force allegations support Count I.

LJCMG also argues that it "cannot be vicariously liable for the unconstitutional conduct of YESCARE because YESCARE is an independent state actor that, according to [Sloan's amended] Complaint, was singularly responsible, through its actions and policies, for providing constitutionally inadequate healthcare to [her]." [DE 17 at 727–28]. The Supreme Court stated in *West v. Atkins*, "[c]ontracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody." 487 U.S. at 56. Further, LJCMG's statement that Sloan claims YESCARE was "singularly" responsible for her inadequate care also misreads her Amended Complaint. [DE 17 at 727–28]. Though Sloan states that "YESCARE maintained the policies and practices which caused [her] to receive wholly inadequate and untimely medical care," she goes on to allege further conduct by LMDC staff (other than YESCARE personnel) and LJCMG, also leading to her constitutional deprivations. [DE 1-1 at 166, 183].

[8] LJCMG also argues under Count VI that it cannot be vicariously liable for YESCARE's conduct. [DE 17 at 726–728]. The Court already disposed of this argument under Count I, the reasoning of which applies with equal force here.

"A municipality may not be held liable under § 1983 on a respondeat superior theory—in other words, 'solely because it employs a tortfeasor.'" *D'Ambrosio v. Marino*, 747 F.3d 378, 388–89 (6th Cir. 2014) (quoting *Monell*, 436 U.S. at 691). "[T]he touchstone of 'official policy' is designed 'to distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible.'" *City of St. Louis v. Praprotnik*, 485 U.S. 112, 138 (1988) (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479-80 (1986)). To demonstrate municipal liability, a plaintiff "must (1) identify the municipal policy or custom, (2) connect the policy to the municipality, and (3) show that [her] particular injury was incurred due to execution of that policy." *Alkire v. Irving*, 330 F.3d 802, 815 (6th Cir. 2003) (citing *Garner*, 8 F.3d at 364).

Standing alone, Count VI of Sloan's Amended Complaint would not constitute a *Monell* claim because it does not allege a policy or custom. [DE 1-1 at 195]. If Sloan's Count VI against LJCMG did rely on a theory of respondeat superior as Moving Defendants allege, it would be foreclosed under § 1983. *D'Ambrosio*, 747 F.3d at 388–89 (quoting *Monell*, 436 U.S. at 691). However, the count re-alleged and incorporated by reference other allegations found in Sloan's Amended Complaint that expressly implicate LMDC and YESCARE policy and custom. [*Id.*]. Specifically, Sloan alleged in the "Common Factual Allegations" section of her Amended Complaint that "[a]t all times relevant to this Amended Complaint, the LMDC's staff, its officers, and the Defendant Medical Providers were acting pursuant to, and in conformity with, LMDC policies and customs related to providing untimely medical treatment for patients. Because of these policies, Ms. Sloan['s] medical necessities were severely and unreasonably delayed." [*Id.* at 183]. She also alleges in the "Parties" section of her Amended Complaint that "YESCARE maintained

the policies and practices which caused [her] to receive wholly inadequate and untimely medical care." [DE 1-1 at 166].

The same standard and underlying facts discussed under Count I apply here. [9] Thus, for the reasons discussed as to Count I, Sloan's allegations sufficiently establish unconstitutional policies or customs of LMDC and YESCARE—and plausibly link those policies to LJCMG. Accordingly, the motion to dismiss Sloan's § 1983 *Monell* claim under Count VI is **DENIED**.

3) Count VII - unlawful policy or custom that violated her Eighth Amendment rights to adequate medical care

Sloan alleges that LJCMG had an unlawful policy or custom that violated her Eighth Amendment rights to adequate medical care. Like her claim under VI, Sloan does not expressly mention a policy or custom under Count VII. [DE 1-1 at 195]. While Moving Defendants argue that Sloan is again relying on a theory of respondeat superior that is precluded under § 1983, *D'Ambrosio*, 747 F.3d at 388–89, Sloan re-alleged and incorporated by reference prior allegations in her Amended Complaint that sufficiently identify unconstitutional LMDC and YESCARE policies and customs, and plausibly tie them to LJCMG. [*Id.*]. These allegations were found sufficient to support a *Monell* claim related to inadequate medical care under Counts I and VI and

[9] The Court notes that Counts I, VI, and VII appear duplicative. All three assert a *Monell* claim against LJCMG based on the same allegedly inadequate medical care in violation of the Fourteenth Amendment. Because the parties do not address this apparent duplication, the Court need not resolve it.

thus are also sufficient here.[10] Accordingly, the motion to dismiss Sloan's claim under Count VII is **DENIED**.

4) Count XI – unlawful policy or custom with regards to failing to protect Sloan from other inmates after the disclosure of her HIV-positive status

In Count XI, Sloan alleges that LJCMG had an unlawful policy or custom that violated her Eighth Amendment rights to protection from other inmates after the disclosure of her HIV-positive status. [DE 1-1 at 198]. [11] Although Count XI does not expressly identify a policy or custom, Sloan incorporates her prior allegations by reference. [*Id.* at 195]. Moving Defendants again argue that she relies on respondeat superior, which cannot support liability under § 1983. *D'Ambrosio*, 747 F.3d at 388–89. The incorporated allegations, however, describe more than Dukes's conduct alone.

Sloan alleges that Dukes made an "unwarranted disclosure of her HIV status to the other inmates" that resulted in the inmates in her dormitory "threaten[ing] [to] physically beat[] [her] up and place[] [her] in a corner of the room away from everyone." [DE 1-1 at 177–78, 198]. She further alleges that she shared these threats with LMDC staff, asked to be removed from her dorm and placed in a single cell, and staff responded with "'Sloan deal with it', or words to that effect."

[10] As noted *infra*, Sloan was a pretrial detainee at the time of the events alleged in the Amended Complaint. [DE 1-1 at 172–74]. While the Eighth Amendment provides a convicted inmate the right to be free from cruel and unusual punishment, the Due Process Clause of the Fourteenth Amendment provides the same protections to a pretrial detainee. *Poynter by & through Fernandez v. Shirley*, No. 25-5188, 2026 WL 2641092, at *2 (6th Cir. Sept. 8, 2026). Therefore, Sloan's Eighth Amendment claims must be dismissed, but the Court will consider whether she has stated a claim under the Fourteenth Amendment. "The Sixth Circuit has historically analyzed Fourteenth Amendment pretrial detainee claims and Eighth Amendment prisoner claims 'under the same rubric.'" *Richmond v. Huq*, 885 F.3d 928, 937 (6th Cir. 2018) (quoting *Villegas v. Metro Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013)). Because Sloan has carried her burden here to adequately allege a *Monell* claim in Count VII for inadequate medical care, the Court need not address the underlying Eighth/Fourteenth Amendment claim any further at this stage.

[11] Again, Sloan was a pretrial detainee at the time of the events alleged in the Amended Complaint, [DE 1-1 at 172–74], and is therefore entitled to protections under the Due Process Clause of the Fourteenth Amendment, not the Eighth Amendment. *Poynter*, 2026 WL 2641092, at *2. Accordingly, Sloan's Eighth Amendment claim must be dismissed, but the Court will consider instead whether she has stated a claim under the Fourteenth Amendment.

[*Id.*]. When the inmates allegedly followed through on their threats, subjecting Sloan to "direct acts of violence," "total social ostracism," and "embarrass[ment]," Sloan again informed staff of the situation and her inability to protect herself from the other inmates. [*Id.* at 177, 198]. At no time during these events is LMDC personnel alleged to have stepped in to intervene on Sloan's behalf. Taking these factual allegations as true, the Amended Complaint identifies one basis for LJCMG's potential liability: LMDC staff's failure to protect Sloan from other inmates.[12]

Whether those allegations do enough to "identify the policy, [and] connect the policy to [LJCMG] itself" is a close call. *Garner*, 8 F.3d at 364. Sloan repeatedly asserts that a policy or custom caused her injuries generally, without naming one. But she also relies on the GAR report, which describes an apparent "tolerance for poor performance and misconduct" at LMDC, [DE 1-1 at 138], and raises concerns about the quality of staff observation checks and staff "apath[y] about . . . high-risk inmate behaviors." [*Id.* at 142–45]. Those observations, considered alongside the alleged disclosure of Sloan's HIV-positive status and refusal by multiple staff members to respond to Sloan's reports, could support an inference of "a custom of tolerance or acquiescence of federal rights violations." *Spears*, 589 F.3d at 256.

At the motion to dismiss stage, Sloan need only plausibly allege an unlawful policy or custom and a direct causal link to her harm. *Daugherty*, 495 F. Supp. 3d at 524. Drawing reasonable inferences in her favor, Dukes's alleged disclosure, other staff member's alleged refusal to protect her once she reported its consequences, and the GAR report's observations plausibly suggest that

[12] The Court therefore construes this claim as one "implicat[ing] the legal rules that apply to claims that jail staff violated the Due Process Clause by failing to protect pretrial detainees from harm." *Lawler as next friend of Lawler v. Hardeman Cnty., Tennessee*, 93 F.4th 919, 926 (6th Cir. 2024). To the extent Sloan alleges an "unwarranted disclosure" of private information here, the Court does not construe that allegation as asserting an independent constitutional claim under the Eighth (or Fourteenth) Amendment. Rather, because Sloan directly raises a Fourteenth Amendment privacy claim based on that alleged disclosure (Count XIII), the Court will refrain from considering it here.

the conduct reflected such a custom. *See Milby v. Underwood*, 713 F. Supp. 3d 383, 391 (W.D. Ky. 2024). Sloan also plausibly connects that conduct to her injuries: she alleges that the disclosure prompted inmates' threats and that staff failed to intervene when the inmates followed through. Taken together, these allegations state a claim that is "plausible" on its face. *Twombly*, 550 U.S. at 570. LJCMG's motion to dismiss Sloan's § 1983 Monell claim under Count XI is therefore **DENIED**.

*ii. <u>§ 1983 Failure to Train and Supervise (Count III)</u>*

1) Count III - Against LJCMG

"A municipality may be liable under an inadequate training theory 'where the risks from its decision not to train its officers were so obvious as to constitute deliberate indifference to the rights of citizens.'" *Troutman v. Louisville Metro Dep't of Corr.*, 979 F.3d 472, 489 (6th Cir. 2020) (quoting *Gray v. City of Detroit*, 399 F.3d 612, 617 (6th Cir. 2005)). Sloan alleges that LJCMG, "[o]ut of deliberate indifference and/or unofficial custom and policy . . . failed to adequately train and/or supervise the correctional officers as to the use of force laws and what constitutes unlawful use of force conduct." [DE 1-1 at 191]. LJCMG maintains that Sloan's pleadings lack sufficient factual allegations to support this claim. [DE 17 at 722–24].

To state a § 1983 claim based on a municipality's failure-to-train or failure-to-supervise, the plaintiff must allege: "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006).

Sloan sufficiently alleges inadequate training here. As set out in an exhibit attached to the Amended Complaint, the GAR report identifies the "[p]oor policy, training and supervision" of

LMDC officers as a "trifecta of failures" present in the facility. [DE 1-1 at 54]. It also highlights a "'disturbing' tolerance of poor performance and misconduct by [LMDC] staff." [*Id.* at 185]. Sloan's allegation in her Amended Complaint that LMDC had a "custom of excessive force used by its officers," as well as her allegation that "[she] was physically beaten without probable cause, nor for any reason[]," supports that finding. [DE 1-1 at 191].

As to the municipality's "deliberate indifference," the plaintiff must either allege: (1) "prior instances of unconstitutional conduct demonstrating that the [municipality] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury"; or (2) "[A] single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation[.]" *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005); *Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 409 (1997). Sloan states that LJCMG's failure to train and supervise was a result of "deliberate indifference" but does not directly offer support for this allegation. [DE 1-1 at 191]. However, the GAR report, attached to Sloan's Amended Complaint, does lend support to this argument. [DE 1-1 at 55]. The report referenced at least one "clear instance of unreasonable force" investigators discovered during a death review "that drew no attention from any ranking officers." It also identified the custom of using "poor restraint practices [at LMDC] that led to unnecessary force," that was "overlooked" by supervisors. [*Id.*]. Moreover, it concluded that LMDC "[c]ustoms and practices regarding the use of force and restraints are dangerous and creat[e] significant liability exposure, especially if there was a civil Monell claim." [*Id.* at 54]. The report similarly identifies "[p]oor policy, training and supervision as the trifecta of failures" plaguing the LMDC. [*Id.*]. Sloan notes that the LJCMG itself commissioned the GAR report, hiring the firm to investigate LMDC and issue findings. [*Id.* at

185]. Taken together, these allegations make it plausible that "[LJCMG] has ignored [this] history of abuse" despite its knowledge. *Daugherty*, 495 F. Supp. 3d at 524 (quoting *Fisher*, 298 F.3d at 849). In sum, Sloan sufficiently alleges deliberate indifference.

Finally, the Amended Complaint sufficiently alleges that "the inadequacy was closely related to or actually caused the injury." *Id.* at 524 (quoting *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006)). Sloan alleges that LMDC has a pattern of excessive force against individuals in its custody, and relies on the GAR Report's conclusion that the "'disturbing' tolerance of poor performance and misconduct by [LMDC] staff . . . create[s] safety risks for the people incarcerated there." [DE 1-1 at 185]. Since Sloan alleges that her injuries from inadequate medical care and a "physical[] beat[ing]" were caused by LMDC officers using excessive force [*Id.* at 187–88, 191], the general deficiencies in LMDC's training and supervision practices relating to force identified in the GAR Report are sufficient to show causation at this stage of the proceedings. *See Milby*, 713 F. Supp. 3d at 391–93. LJCMG's motion to dismiss will therefore be **DENIED** as to the failure-to-train claim.

2) Count III - Against Collins in His Individual Capacity

Separately, Defendant Collins contends that as a supervisor he cannot be held individually liable under § 1983 for failure to supervise. [DE 17 at 723–24]. "[A] failure of a supervisory official to supervise, control, or train the offending individual [employees] is not actionable absent a showing that the official either encouraged or in some way directly participated in it." *Hays v. Jefferson Cnty., Ky.*, 668 F.2d 869, 874 (6th Cir. 1982). To ultimately prove the claim at trial, "[a]t a minimum a plaintiff must show that the official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending [employees]." *Id.* "A mere failure to act will not suffice to establish supervisory liability." *Essex v. Cnty. of Livingston*, 518 F.

App'x 351, 355 (6th Cir. 2013) (citing *Gregory v. City of Louisville*, 444 F.3d 725, 751 (6th Cir. 2006)).

The Sixth Circuit has found supervisory liability exists where a supervisor's active performance of a job function directly results in the plaintiff's injury. *Id. See e.g.*, *Hill v. Marshall*, 962 F.2d 1209, 1213 (6th Cir.1992) (supervisor personally received inmates' complaints and referred them to nursing staff whom he knew were improperly altering and destroying inmate prescriptions); *Taylor v. Michigan Department of Corrections*, 69 F.3d 76 (6th Cir.1995) (supervisor approved inmates' transfers despite knowing that inmates' files were not reviewed before transfer, directly resulting in the plaintiff's injury). "This sort of 'direct participation' or, at the very least, active acquiescence in the known misconduct are likely examples of the outer bounds of the 'active performance' necessary for a supervisory liability claim." *Essex*, 518 F. App'x at 355 (quoting *Gregory*, 444 F.3d at 752). At the motion to dismiss stage, a plaintiff need only allege facts, that accepted as true and with reasonable inferences drawn in her favor, plausibly show that the supervisor, through the execution of his job functions, "at least knowingly acquiesced in the unconstitutional conduct of [his subordinates]," and that his own acts or omissions were causally connected to the plaintiff's injury. *See Peatross v. City of Memphis*, 818 F.3d 233, 243 (6th Cir. 2016) (holding allegations that police director knew of repeated officer shootings, acknowledged deficiencies in departmental practices but failed to correct them, and inadequately investigated and "rubber stamped" officer misconduct plausibly established that he knowingly acquiesced in his subordinates' unconstitutional conduct and that his acts and omissions were causally connected to the plaintiff's death by officer-involved shooting).

Here, there is no allegation in the Amended Complaint that Collins directly participated in or encouraged Sloan's alleged constitutional deprivations. Instead, Sloan argues that by virtue of

being "responsible for the training and/or supervising of the correctional officers hired and employed by the [LJCMG]," Collins's "failure to act in the face of known, repeated constitutional violations" is sufficient to find supervisory liability. [DE 20 at 769]. She specifically alleges that Collins: "intentionally and knowingly ignored [LMDC's] own policies and turned a blind eye to acts of . . . unreasonable force . . . [and] violence committed by [LMDC] officers upon individuals in its care, and as such violated [her] constitutional rights," [DE 1-1 at 190–91], "Rubber Stamped" these practices and/or customs "by acquiescing to the said customs and practices of the officers and refusing and/or ignoring to conduct proper investigations into the alleged misconduct of its officers accused of excessive and unnecessary force against LMDC's inmates," [*Id.* at 188], and that his failure to "adequately train and/or supervise the correctional officers as to the use of force laws and what constitutes unlawful use of force conduct" resulted in her being "physically beaten without probable cause, nor for any reason[]." [*Id.* at 191].[13]

As indicated, the Amended Complaint goes a step further by attaching as an exhibit the GAR report from August 2022, which was prepared by a firm hired by LJCMG to investigate LMDC. [*Id.* at 137–53]. The report highlights that following recent death reviews, the investigators found "a clear instance of unreasonable force that drew no attention from any ranking officers" and that "poor restraint practices [leading] to unnecessary force" were "overlooked" by

[13] Sloan's relevant allegation under Count III reads in full: "As a result, Ms. Sloan was physically beaten without probable cause, nor for any reasons or are acts that legitimates such an act created by the Defendant Officer and committed by the inmates." [DE 1-1 at 191]. The Court construes this statement as alleging that officers used force against Sloan because Count III principally concerns the failure to train and supervise officers in the use of force. [*Id.* at 190–92]. The statement's second half is difficult to parse but appears to refer obliquely to Dukes's alleged disclosure of Sloan's HIV-positive status to other inmates and the violence they allegedly inflicted on her as a result. Sloan does not explain how that disclosure or the resulting inmate violence relates to Collins's failure to train or supervise officers in the use of force as alleged in Count III. Accordingly, the Court addresses Count III as alleging a failure to train or supervise officers in the use of force and declines to supply a connection that Sloan has not articulated between that claim and the alleged inmate violence.

supervisors. [*Id.* at 146]. It also noted that at the time, "there [wa]s no tracking or system to review these incidents," [*Id.*], and a general "tolerance for poor performance and misconduct" by LMDC personnel. [*Id.* at 138]. While compelling neither the report nor the Amended Complaint indicate that Collins was in his supervisory role as Director of LMDC during the times relevant to the firm's investigation. [*Id.* at 138–40, 172, 185–86]. The actionable conduct in this case did not occur until Sloan entered LMDC custody in Spring 2024, over a year after the report was issued. [*Id.* at 172]. Even so, Sloan alleges that Collins "knew and/or should have known" of the violence committed by LMDC officers, [*Id.* at 191], and argues that he failed to act "in the face of known, repeated constitutional violations." [DE 20 at 769].

Although the GAR report predates Sloan's detention by more than a year and Collins's tenure during the period investigated is unclear, Sloan alleges that she experienced the same officer violence and supervisory failures documented in the report. That correspondence supports a reasonable inference that those problems persisted during her detention. Considered alongside Sloan's allegations that Collins knew of the violence yet failed to address it, these allegations plausibly support his knowing acquiescence at this stage. *Peatross*, 818 F.3d at 243. While a close call, the Court, accepting the allegations as true and drawing reasonable inferences in Sloan's favor, will allow the claim to proceed to discovery. Therefore, Collins's motion to dismiss Count III against Collins for failure to state a claim is **DENIED**.[14]

[14] Although the Court addresses qualified immunity more fully *infra*, it resolves Collins's assertion of that defense as to Count III here because the analysis substantially overlaps with the foregoing discussion of his supervisory liability. To overcome qualified immunity, Sloan must show that (1) Collins's conduct violated a constitutional right and (2) that right was clearly established at the time of the alleged misconduct. *Barber v. Miller*, 809 F.3d 840, 844 (6th Cir. 2015). As discussed, Sloan has plausibly alleged Collins's knowing acquiescence in unconstitutional officer violence and a causal connection to her injuries, satisfying the first prong at this stage. For the second prong, Sloan need not establish a separate constitutional right to adequate training or supervision. *Peatross*, 818 F.3d at 245. The relevant inquiry concerns the right violated by Collins's subordinates. *Id.* Before Sloan's detention, Sixth Circuit precedent clearly prohibited gratuitous

b. Qualified Immunity (Counts II, III, VI, VII, VIII, IX, X, XI, XII, and XIII)

Dukes and Collins contend that they are entitled to the protections of qualified immunity for Sloan's federal law claims against them in their individual capacities (Counts II, III, VI, VII, VIII, IX, X, XI, XII, and XIII). [DE 17 at 735, 737 ("[Sloan] has not pointed to any existing precedent clearly establishing, beyond debate, that any action . . . Collins or . . . Dukes took during the course of [her] detention violated clearly established federal law.")]. Sloan disagrees: "No reasonable officer at LMDC in 2024, after the issuance of [cited] reports and the thirteen in-custody deaths that prompted them, could have believed it was constitutional to deny an inmate her life-sustaining HIV medication for months, publicly broadcast her medical status, or respond to her pleas for protection by telling her to 'deal with it.'" [DE 20 at 782].

"In the interest of protecting public officers in the course of performing their discretionary duties from unduly onerous lawsuits under § 1983, the Supreme Court has recognized 'qualified immunity' for such officers, 'shielding them from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated.'" *Lyons v. City of Xenia*, 258 F. Supp. 2d 761, 775 (S.D. Ohio 2003) (quoting *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)); *Penman v. Correct Care Sols.*, No. 5:18-CV-58-TBR, 2018 WL 6242153, at *6 (W.D. Ky. Nov. 26, 2018) ("Under federal qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818

---

assaults on subdued, nonresisting detainees. *Coley v. Lucas Cnty., Ohio*, 799 F.3d 530, 539–40 (6th Cir. 2015). Construed in her favor, Sloan's allegations that officers beat her "without probable cause[] nor for any reason" plausibly describes such gratuitous force. [DE 1-1 at 191]. Accordingly, accepting the allegations and reasonable inferences identified *supra*, Collins is not entitled to qualified immunity on Count III at this stage, *Coley*, 799 F.3d at 541–42; *Peatross*, 818 F.3d at 245, and his motion to dismiss Count III against him on those grounds is **DENIED**.

(1982)). "Qualified immunity is a defense only to individual capacity claims." *Meogrossi v. Aubrey*, No. 3:09CV-00301-JDM, 2011 WL 1235063, at *6 (W.D. Ky. Mar. 31, 2011).

When a defendant invokes qualified immunity, it is the plaintiff's burden to show: (1) the defendant's acts violated a constitutional right and (2) the right was clearly established at the time of the defendant's alleged misconduct. *Barber*, 809 F.3d at 844. "To survive a motion to dismiss on qualified-immunity grounds, both inquiries must be resolved in the Plaintiffs' favor." *Hoskins v. Knox Cty., Kentucky*, No. CV 17-84-DLB-HAI, 2018 WL 1352163, at *19 (E.D. Ky. Mar. 15, 2018). For a right to be clearly established, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 845 (quoting *Leonard v. Robinson*, 477 F.3d 347, 355 (6th Cir. 2007)). When determining whether a right is clearly established, courts are instructed to consider the "specific context of the case" and to avoid construing rights too generally. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Hagans v. Franklin Cnty. Sherriff's Office*, 695 F.3d 505, 508 (6th Cir. 2012). Once the right is properly defined, the Court determines whether a right is clearly established by examining cases from the Supreme Court, the Sixth Circuit, and other circuits. *Barber*, 809 F.3d at 845 (quoting *Andrews v. Hickman Cnty.*, 700 F.3d 845, 853 (6th Cir. 2012)). "At the pleading stage, this burden is carried by alleging facts plausibly making out a claim that the defendant's conduct violated a constitutional right that was clearly established law at the time, such that a reasonable officer would have known that his conduct violated that right." *Hoskins*, 2018 WL 1352163, at *19.

Additionally, the Sixth Circuit has noted that "it is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity," because even though "an officer's 'entitlement to qualified immunity is a threshold question to be resolved at the earliest possible point,'" this is typically done at the summary judgment phase "and not [by]

dismissal under Rule 12." *Wesley v. Campbell*, 779 F.3d 421, 433–34 (6th Cir. 2015) (quoting *Vakilian v. Shaw*, 335 F.3d 509, 516 (6th Cir. 2003)). There is no heightened factual showing that a plaintiff must make to survive a motion to dismiss on qualified immunity grounds that differs from the plausibility standard established under *Iqbal*. *Id.* at 427–28. Although qualified immunity does protect the defendant from all burdens of litigation, including "the burdens of discovery," *Iqbal*, 556 U.S. at 672 (citations omitted), the fact-intensive nature of a qualified immunity defense makes it "difficult for a defendant to claim qualified immunity on the pleadings before discovery." *Wesley*, 779 F.3d at 434 (quoting *Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Village Sch. Dist.*, 428 F.3d 223, 235 (6th Cir. 2005) (Sutton, J., concurring)).

Sloan alleges that Dukes and Collins, in their individual capacities, violated her constitutional rights on Fourteenth and Eighth Amendment grounds.

*i. Fourteenth Amendment (Counts VI, IX, X, and XIII)*

Sloan contends that Dukes violated her rights under the Fourteenth Amendment to both procedural and substantive due process, and equal protection of the law, by denying her HIV medication, violating her privacy by making an unwarranted disclosure of her HIV-positive status to other inmates, depriving her of the right "to use the . . . clippers and the equipment in the gym," and treating her "arbitrarily worse" than other inmates because of her HIV-positive status. [DE 1-1 at 195–97, 198–99]. Sloan alleges that Collins also violated her substantive due process rights by denying her HIV medication. [*Id.*].

The Due Process Clause of the Fourteenth Amendment says that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const., amend. XIV, § 1. "This clause ensures fair process and safeguards a substantive sphere as well, barring certain government actions regardless of the fairness of the procedures used to implement them."

*Schulkers v. Kammer*, 955 F.3d 520, 539 (6th Cir. 2020) (cleaned up) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998)). The Equal Protection Clause of the Fourteenth Amendment provides that a state shall not "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Accordingly, the Equal Protection Clause prohibits states from "making distinctions that (1) burden a fundamental right; (2) target a suspect class; or (3) intentionally treat one individual differently from others similarly situated without any rational basis." *Johnson v. Bredesen*, 624 F.3d 742, 746 (6th Cir. 2010) (citing *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 312 (6th Cir. 2005)).

Sloan argues that Dukes and Collins violated her due process rights procedurally and substantively in the present case. First, Sloan argues that Dukes and Collins violated her substantive right to adequate medical care because they denied her necessary HIV medication and "acted with deliberate indifference to [her] serious medical needs." [DE 1-1 at 195]. Second, Sloan argues that Dukes violated her substantive right to privacy because he disclosed her HIV-positive status to other inmates. [*Id.* at 199]. Third, Sloan argues that Dukes also violated her procedural due process right when he prevented her from using the clippers and equipment in the gym. [*Id.* at 197]. Fourth, Sloan argues that Dukes also violated her right to equal protection by treating her "arbitrarily worse" than other inmates because of her HIV-positive status. [*Id.* at 196–97].

1) Substantive Rights (Counts VI and XIII)

Substantive due process claims come in two varieties: "(1) deprivations of a particular constitutional guarantee; and (2) actions that 'shock the conscience.'" *Pittman v. Cuyahoga Cnty. Dep't of Child. & Fam. Servs.*, 640 F.3d 716, 728 (6th Cir. 2011) (quoting *Valot v. Se. Local Sch. Dist. Bd. of Educ.*, 107 F.3d 1220, 1228 (6th Cir. 1997)). Sloan alleges that Dukes and Collins

violated her substantive due process rights to adequate medical care, and that Dukes alone violated her substantive due process rights to privacy. [DE 1-1 at 195, 198–99].

a. Adequate Medical Care (Count VI)

Sloan alleges that Dukes and Collins, in their individual capacities, violated her substantive due process right to adequate medical care because they denied her necessary medical care and "acted with deliberate indifference to [her] serious medical needs." [*Id.* at 195]. In response, they argue that they are entitled to qualified immunity. [DE 17 at 735–37]. When a defendant invokes qualified immunity at the motion to dismiss stage, it is the plaintiff's burden to plausibly show: (1) the defendant's acts violated a constitutional right and (2) the right was clearly established at the time of the defendant's alleged misconduct. *Barber*, 809 F.3d at 844.

The Due Process Clause of the Fourteenth Amendment requires government officials to provide adequate medical care to pretrial detainees and others in their custody who are not serving a sentence. *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983). That includes a person like Sloan, being held at LMDC before an adjudication. *Weston v. Louisville Metro. Gov't*, No. 3:23-CV-147-BJB, 2024 WL 3502968, at *4 (W.D. Ky. July 22, 2024). "An officer violates that right if that officer shows deliberate indifference to [a pretrial detainee's] serious medical needs . . ." *Hyman v. Lewis*, 27 F.4th 1233, 1237 (6th Cir. 2022) (internal citations and quotation marks omitted). To ultimately prevail on this claim, Sloan must show that (1) she "had a sufficiently serious medical need" and (2) that [Dukes and Collins] acted deliberately (not accidentally), [and] also recklessly in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Helphenstine v. Lewis Cnty., Ky.*, 60 F.4th 305, 317 (6th Cir. 2023) (quoting *Brawner v. Scott Cnty.*, 14 F.4th 585, 596 (6th Cir. 2021)) (internal quotation marks omitted). At the pleading stage, Sloan must allege facts plausibly demonstrating

these requirements. *Hoskins*, 2018 WL 1352163, at *19. "These requirements are known as the 'objective' and 'subjective' components of the claim, respectively." *Heeter v. Bowers*, 99 F.4th 900, 916 (6th Cir. 2024). For the objective component, "[a] serious medical need is one 'that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Greene v. Crawford Cnty., Michigan*, 22 F.4th 593, 607 (6th Cir. 2022) (quoting *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008)). For the subjective test, "[t]he violation arises from an officer's decisions in the face of the risk of harm, and the law does not look to whether the officer's action or inaction has a causal connection to the fate of the detainee." *Heeter*, 99 F.4th at 916. That is, we are not asking if Dukes's and Collins's failure to provide medical care was a but-for cause of Sloan's injuries. *Id.* Instead, we are asking if, under Sixth Circuit precedent's objective and subjective tests, Dukes and Collins violated Sloan's due process rights to adequate medical care in LMDC custody. Because the Sixth Circuit has held that "in general, the Fourteenth Amendment right of pretrial detainees to adequate medical care is, and has long been, clearly established," *Est. of Owensby v. City of Cincinnati*, 414 F.3d 596, 604 (6th Cir. 2005), the analysis in Sloan's case turns on whether she can plausibly allege a constitutional violation occurred.

Here, although it is a close call, Sloan sufficiently alleges a violation of her right to adequate medical treatment by Dukes and Collins. According to her Amended Complaint, Dukes and Collins "deprived [Sloan] of her right . . . to adequate medical care" and acted with "deliberate indifference" to her serious medical needs when they denied her treatment. [DE 1-1 at 111]. Having been diagnosed with HIV by a doctor and prescribed treatment, Sloan had a serious medical need when she arrived in LMDC custody. *Greene*, 22 F.4th at 607. Further, Sloan makes allegations from which the Court can reasonably infer that Collins and Dukes, "acted deliberately (not

accidentally), [and] also recklessly in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Helphenstine*, 60 F.4th at 317 (quoting *Brawner*, 14 F.4th at 596 (cleaned up). Throughout her Amended Complaint, Sloan alleges that she informed LMDC staff and officers and YESCARE personnel about her serious medical need and symptoms she was suffering due to lack of medical attention while she was in custody, including LMDC "staff members," "medical staff," "officers and employees," "nurses," and the "shift nurse," and that they continued to ignore her need and requests. [DE 1-1 at 172–75, 178–79, 181–83]. The Court can infer from her allegations that Collins and Dukes, as LMDC staff and officers, knew that she was HIV positive, knew she was not getting treatment, and deliberately ignored her requests for medical care. Therefore, Dukes's and Collins's motion to dismiss Sloan's adequate medical care claims based on qualified immunity is **DENIED**.

b. Privacy (Count XIII)

Sloan alleges that Dukes violated her substantive due process right to privacy because he made an "unwarranted disclosure of her HIV- positive status" to other inmates. [DE 1-1, 175–77]. In response, he argues that he is entitled to qualified immunity. [DE 17 at 735]. When a defendant invokes qualified immunity, it is the plaintiff's burden to plausibly allege: (1) the defendant's acts violated a constitutional right and (2) the right was clearly established at the time of the defendant's alleged misconduct. *Barber*, 809 F.3d at 844. In other words, "[o]nce the qualified immunity defense is raised, the burden is on the plaintiff to demonstrate that the officials are not entitled to qualified immunity." *Robertson v. Lucas*, 753 F.3d 606, 615 (6th Cir. 2014) (quoting *Binay v. Bettendorf*, 601 F.3d 640, 647 (6th Cir. 2010)). The Court may address either determination first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

"Two types of interests have been identified by the Supreme Court as protected by the right to privacy that is rooted in the substantive due process protections of the Fourteenth Amendment." *Lambert v. Hartman*, 517 F.3d 433 (6th Cir. 2008). "One is the interest in 'independence in making certain kinds of important decisions.'" *Id.* (quoting *Whalen v. Roe*, 429 U.S. 589, 599–600 & n.26 (1977)). The other type of privacy interest is the "interest in avoiding disclosure of personal matters." *Whalen*, 429 U.S. at 599, 603–04. "[Sloan's] claim implicates the latter interest, i.e. the 'individual's right to control the nature and extent of information released about that individual,' which 'has been coined an informational right to privacy.'" *Gardner v. Burgess*, No. 1:25-CV-1191, 2025 WL 3181603 (W.D. Mich. Nov. 14, 2025) (quoting *Bloch v. Ribar*, 156 F.3d 673, 683 (6th Cir. 1998)). The Sixth Circuit has held that this right to informational privacy only protects "interests that implicate a fundamental liberty interest." *Lee v. City of Columbus, Ohio*, 636 F.3d 245, 260 (6th Cir. 2011) (citing *Bloch*, 156 F.3d at 684). In other words, the asserted privacy interest must involve "rights that can be deemed 'fundamental' or 'implicit in the concept of ordered liberty.'" *J. P. v. DeSanti*, 653 F.2d 1080, 1090 (6th Cir. 1981). In a case similar to the instant one, *Moore v. Prevo*, the Sixth Circuit recognized a Fourteenth Amendment privacy interest in having sensitive medical information, like HIV-positive status, kept confidential from other inmates. 379 F. App'x 425, 428 (6th Cir. 2010) ("[I]nmates have a Fourteenth Amendment privacy interest in guarding against disclosure of sensitive medical information from other inmates subject to legitimate penological interests.").

Here, Sloan's Amended Complaint suggests that other inmates were present when Dukes made his statements regarding her HIV-positive status and in fact overheard the conversation. [DE 1-1 at 175–76]. Therefore, in keeping with the foregoing, the Court concludes that Sloan plausibly alleged a violation of her Fourteenth Amendment right to privacy when Dukes disclosed her HIV-

positive to other inmates. Thus, the Court must determine if Sloan carried her burden to plausibly allege the right was clearly established at the time of the alleged violation. "A right is 'clearly established' if 'every reasonable official would have understood that what he is doing violates that right.'" *Kenjoh Outdoor, LLC v. Marchbanks*, 23 F.4th 686, 694 (6th Cir. 2022) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)). "And although the plaintiff need not provide 'a case directly on point,' the 'existing precedent must have placed the . . . question beyond debate.'" *Id.* "The point is to give the official 'fair notice' that his actions violated the plaintiff's rights." *Id.* (quoting *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021)). "For this reason, we look to the law at the time the official acted." *Id.* (citing *Pearson*, 555 U.S. at 244). Here, at the time Dukes allegedly acted, the Sixth Circuit had recognized almost ten years earlier that inmates like Sloan have a Fourteenth Amendment privacy interest in guarding against disclosure of sensitive medical information—specifically, their HIV-positive status—from other inmates. *Moore*, 379 F. App'x at 428. Accordingly, Sixth Circuit precedent places this question "beyond debate." *Marchbanks*, 23 F.4th at 694.

Dukes attempts to get around this fact by casting doubt on *Moore*. He highlights that since the Sixth Circuit recognized the privacy interest in *Moore*, "the District Courts have considered [the case] to be nonbinding and poorly reasoned." [DE 17 at 734–35]. In support, Dukes cites several federal district court decisions from within the Sixth Circuit holding such a disclosure does not implicate an inmate's Fourteenth Amendment privacy interest, even after *Moore*. [*Id.*]. *See e.g.*, *Holden v. Michigan Dep't of Corr.*, No. 1:12-CV-284, 2012 WL 2317538, at *5 (W.D. Mich. June 18, 2012) (holding that "disclosure of [inmate's] health and/or HIV status to prison officials and other inmates does not implicate a fundamental interest protected by the right to privacy under the Fourteenth Amendment"); *Jones v. Crompton*, No. 1:13-CV-490, 2013 WL 3967159, at *4 (W.D.

Mich. Aug. 1, 2013) (arguing that *Moore* "is neither binding nor persuasive in light of other published Sixth Circuit authority both predating *Moore* (*Wigginton*), and post-dating *Moore* (*Lee*)"). But Dukes's reliance on how other district courts within this circuit have applied or distinguished *Moore* does not alter this Court's obligation to follow binding Sixth Circuit precedent. Those decisions are not binding on this Court, and the Sixth Circuit's holding is clear and applies to the conduct alleged here. Decided more than ten years before the events at issue, *Moore* provided sufficiently clear notice that every reasonable official would have understood that the alleged disclosure of Sloan's HIV-positive status to other inmates violated her Fourteenth Amendment privacy interest in guarding against disclosure of this sensitive medical information. *Marchbanks*, 23 F.4th at 694 (quoting *Mullenix*, 577 U.S. at 12). Accordingly, Sloan has carried her burden "by alleging facts plausibly making out a claim that [Dukes] conduct violated a constitutional right that was clearly established law at the time." *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015) (citing *Wesley v. Campbell*, 779 F.3d 421, 428 (6th Cir.2015)).

Therefore, at this stage of litigation, Dukes's Motion to Dismiss Sloan's Fourteenth Amendment privacy claim against him based on qualified immunity is **DENIED**.

2) Procedural Right (Gym Resources) (Count X)

The Fourteenth Amendment prohibits any state from depriving "any person of life, liberty, or property without due process of law," and protects "the individual against arbitrary action of government." *Kentucky Dept. of Corr. v. Thompson*, 490 U.S. 454, 459–60 (1989); *Meachum v. Fano*, 427 U.S. 215, 223 (1976); *Wolf v. McDonnell*, 418 U.S. 539, 558 (1974). "[T]hose who seek to invoke its procedural protection must establish that one of these interests is at stake." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). "Accordingly, a procedural due process analysis addresses two questions." *Bazzetta v. McGinnis*, 430 F.3d 795, 801 (6th Cir. 2005). "[T]he first asks whether

there exists a liberty or property interest which has been interfered with by the State, the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Id.* (quoting *Thompson*, 490 U.S. at 460).

In the context of liberty interests claimed by inmates, "courts are mindful that imprisonment necessarily 'carries with it the circumscription or loss of many significant rights.'" *Id.* (quoting *Hudson v. Palmer*, 468 U.S. 517, 524 (1984)). The "curtailment of certain rights is necessary, as a practical matter, to accommodate a myriad of 'institutional needs and objectives' of prison facilities, chief among which is internal security." *Hudson*, 468 U.S. at 524 (cleaned up). Thus, not every "action taken for a punitive reason encroaches upon a liberty interest under the Due Process Clause." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). "Prisoners, however, retain a 'residuum of constitutionally protected liberty,' . . . that emanates from two discrete sources: (1) state law can establish a protectible liberty interest, or (2) the Constitution can create a liberty interest when a condition or restraint is so egregious as to implicate the Due Process Clause itself." *Bazzetta*, 430 F.3d at 801 (quoting *Thompson*, 490 U.S. at 466 (Marshall, J., dissenting)).

Relying on a Kentucky state law, Sloan argues that Dukes "deprive[d]" her of her right "to use the . . . clippers and the equipment in the gym . . . without giving her due process of law." [DE 1-1, 197]. Specifically, Sloan cites to Section 8 of the Kentucky Administrative Regulations ("KAR"), which dictates that "adequate space shall be provided within the state confinement facility to allow inmates an opportunity to obtain physical exercise," 902 KAR 9:010, and Section 197.020 of the Kentucky Revised Statutes ("KRS"), that in her telling "ensures that LMDC inmates have access to necessary grooming services to maintain personal hygiene." [DE 1-1 at 197]. In response, Dukes argues that neither of the grounds cited by Sloan are "a sufficient source of state law upon which to support her procedural due process claim." [DE 17 at 731]. As such, he

argues that a constitutional violation has not occurred and he is entitled to qualified immunity. [DE 17 at 735–37; DE 25 at 1272–73]. The inquiry then becomes at this stage of the litigation whether Sloan, based on applicable law and the facts viewed in the light most favorable to her, has carried her burden in plausibly alleging that she suffered a constitutional deprivation. *Bell v. Johnson*, 308 F.3d 594, 601 (6th Cir. 2002).

Thus, the issue is whether Sloan has met her initial burden of plausibly alleging she had a constitutionally protected liberty interest in using the gym equipment under Kentucky law. As highlighted by Dukes, [DE 17 at 731], KRS 197.020 does not create a property interest for inmates like Sloan—it merely authorizes the promulgation of Kentucky administrative regulations. *See Runkle v. Fleming*, 558 F. App'x 628, 632–33 (6th Cir. 2014) (noting that Kentucky's administrative regulations authorized by K.R.S. § 197.020(1)(b) to preserve the health of prisoners "do not provide any private right of action for prisoners to sue the corrections facility, its employees, or its agents"). Therefore, KRS 197.020 does not confer the constitutionally protected liberty interest she suggests it does. Sloan similarly fails to plausibly allege that her rights were violated under 902 KAR 9:010. These types of "regulations are primarily designed to guide correctional officials in the administration of a prison . . . [not to] confer rights on inmates" like Sloan. *Conner*, 515 U.S. at 481–82. Because Sloan fails to sufficiently allege a source of state law establishing a protectible liberty interest in the gym equipment, she cannot plausibly allege a constitutional deprivation of her procedural due process rights. *See Bazzetta*, 430 F.3d at 801.[15] Accordingly, Sloan has failed to carry her burden in demonstrating that Dukes is not entitled to

[15] Because Sloan did not plausibly allege that she suffered a constitutional deprivation, the court need not reach whether the right to use prison resources like gym equipment or clippers was "clearly established" at the time Sloan was in LMDC custody. *See Hoskins v. Knox Cty., Kentucky*, No. CV 17-84-DLB-HAI, 2018 WL 1352163, at *19 (E.D. Ky. Mar. 15, 2018).

qualified immunity, *Barber*, 809 F.3d at 844, and her procedural due process claim against Dukes is **DISMISSED**.

3) Equal Protection (Count IX)

Sloan asserts under Count IX that her Fourteenth Amendment equal protection rights were violated by Dukes when he treated her "arbitrarily worse" than other inmates "by refusing [to let her] use the clippers and the equipment in the gym" because of her HIV-positive status. [DE 1-1 at 196–97]. Dukes asserts that Sloan fails to state a claim upon which relief may be granted, and that he is entitled to qualified immunity. [DE 17 at 728–30, 735–37].

The Fourteenth Amendment's Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). The threshold element of an equal protection claim is disparate treatment. *Center for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) ("To state an equal protection claim, a plaintiff must adequately plead that the government treated the plaintiff 'disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis.'" (citation omitted)). An "equal protection" plaintiff must be similarly situated to her comparators "in all relevant respects[.]" *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992); *see also Umani v. Mich. Dep't of Corr.*, 432 F. App'x 453, 460 (6th Cir. 2011) (holding that to be a similarly-situated person, "the comparative [person] 'must have dealt with the same [decisionmaker], have been subject to the same standards, and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or [the defendant's] treatment of them for it'") (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)). The Court has already held that Sloan's alleged denial of access to gym equipment did not burden a

fundamental right. And "HIV-infected inmates do not constitute a suspect class that is entitled to special consideration under the Equal Protection Clause." *Mofield v. Bell*, 3 F. App'x 441, 443 (6th Cir. 2001) (citing *Doe v. Wigginton*, 21 F.3d 733, 739–40 (6th Cir.1994)). Accordingly, Sloan must plausibly allege that any disparate treatment lacked a rational basis. *Napolitano*, 648 F.3d at 379. Under a "class of one" theory, she may do so by alleging that "she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam).

Here, Sloan's allegations plausibly support an equal protection claim against Dukes. Sloan alleges that Dukes refused to allow her to use the clippers and gym equipment available to other inmates because of her HIV-positive status. [DE 1-1 at 196–97]. She thus identifies a specific instance of disparate treatment, and the characteristic motivating it. *See Napolitano*, 648 F.3d at 379. Construed in her favor, these allegations permit a reasonable inference that Sloan and the other inmates were similarly situated in the respects relevant to accessing those resources: they were housed in the same dormitory and sought to use the same equipment, subject to Dukes's control, and Sloan was excluded because of her HIV-positive status. *Nordlinger*, 505 U.S. at 10. Moreover, considered alongside Dukes's alleged disclosure of her HIV-positive status to other inmates, the alleged exclusion plausibly reflects intentional hostility towards Sloan's status rather than a rational distinction concerning access to equipment.[16] Sloan therefore plausibly alleges both

---

[16] Relying on *Mofield v. Bell*, Dukes argues that the challenged restrictions rationally furthered the legitimate state purpose of preventing the spread of communicable disease. [DE 17 at 729–30]. Although preventing the spread of disease transmission is a legitimate governmental interest, *Mofield* does not establish that every restriction imposed on an inmate because of her HIV-positive status necessarily bears a rational relationship to that interest. 3 F. App'x at 443. At the motion to dismiss stage, Sloan must plausibly allege the absence of a rational basis for that treatment—not prove her claim. *Napolitano*, 648 F.3d at 379. Accepting her factual allegations as true and drawing reasonable inferences in her favor, the Court concludes that Sloan has plausibly alleged that the denial of gym access lacked a rational relationship to the asserted purpose. Whether she can ultimately establish that claim is a separate question the Court need not reach at this stage of the litigation.

disparate treatment and the absence of a rational basis for that treatment. *Napolitano*, 648 F.3d at 379. As such, Sloan's "[f]actual allegations [are] enough to raise a right to relief above the speculative level[.]" *Twombly*, 550 U.S. at 555.

Even so, Dukes's argues that dismissal is still appropriate because he is entitled to qualified immunity. When a defendant invokes qualified immunity, it is the plaintiff's burden to plausibly allege: (1) the defendant's acts violated a constitutional right and (2) the right was clearly established at the time of the defendant's alleged misconduct. *Barber*, 809 F.3d at 844. Because the Court concluded that Sloan plausibly alleged a violation of her Fourteenth Amendment right to equal protection, the relevant determination becomes whether she plausibly alleged the right was clearly established at the time of the alleged violation. *Id.* "A right is 'clearly established' if 'every reasonable official would have understood that what he is doing violates that right.'" *Marchbanks*, 23 F.4th at 694 (quoting *Mullenix*, 577 U.S. at 12). "And although the plaintiff need not provide 'a case directly on point,' the 'existing precedent must have placed the . . . question beyond debate.'" *Id.* "The point is to give the official 'fair notice' that his actions violated the plaintiff's rights." *Id.* (quoting *Rivas-Villegas*, 595 U.S. at 5). "For this reason, we look to the law at the time the official acted." *Id.* (citing *Pearson*, 555 U.S. at 244).

Here, the relevant precedent provided fair warning that an official could not deny an inmate access to otherwise available resources solely out of animus toward her HIV-positive status. In *Stemler v. City of Florence*, the Sixth Circuit explained that the prohibition against state action motivated solely by a desire to harm an unpopular group was clearly established. 126 F.3d 856, 873–74 & n.15 (6th Cir. 1997). The Sixth Circuit subsequently applied that principle in the prison context in *Davis v. Prison Health Services*, holding that an inmate plausibly alleged an equal protection violation when officials allegedly exclude him for a public-works program because of

anti-gay animus, using concerns about his medical condition as pretext. 679 F.3d 433, 438–40 (6th Cir. 2012). Although those decisions involved discrimination based on sexual orientation, they provided notice that an official could not use a purported health justification to exclude an inmate from available resources solely to effectuate hostility toward her membership in an identifiable group.

*Anderson v. Romero* further supports applying that principle to the specific restrictions alleged here. 72 F.3d 518, 526–27 (7th Cir. 1995). There, the Seventh Circuit considered allegations that officials denied an HIV-positive inmate haircuts and exercise privileges because of his status. *Id.* The court explained that, if HIV status was the sole reason for the restrictions and no conceivable justification supported them as disease prevention measures, the absence of precedent addressing the precise restrictions would not confer immunity. *Id.* Although out-of-circuit authority clearly establishes a right in this Circuit only in "extraordinary" circumstances, when it "'point[s] *unmistakably* to' a holding and [is] 'so *clearly* foreshadowed by applicable direct authority as to leave no doubt' regarding that holding," *Ashford v. Raby*, 951 F.3d 798, 804 (6th Cir. 2020) (quoting *Ohio Civil Serv. Emps. Ass'n v. Seiter*, 858 F.2d 1171, 1177 (6th Cir. 1988)), *Anderson* reinforces the notice supplied by *Stemler* and *Davis* concerning materially similar conduct. Read together, these decisions provided fair warning that arbitrarily denying an inmate access to grooming and exercise resources solely out of hostility toward her HIV status violated equal protection. *Marchbanks*, 23 F.4th at 694.

Whether Dukes's conduct ultimately fits that description requires further factual development. His alleged exclusion of Sloan from equipment available to other inmates in the same dormitory, considered alongside his alleged disclosure of her HIV-positive status, plausibly supports an inference of animus. Although the pleadings leave uncertainty about his reasons for

imposing the restrictions and the circumstances bearing on their justification, Sloan need not satisfy a heightened factual pleading requirement merely because Dukes invokes qualified immunity. *Wesley*, 779 F.3d at 427–28. Moreover, the Sixth Circuit has cautioned that the fact-intensive nature of qualified immunity often makes summary judgement the appropriate stage for resolving the defense. *Id.* at 433–34. *Anderson* likewise recognized that additional facts could reveal another reason for HIV-based restrictions or a justification not apparent from the pleadings. 72 F.3d at 527. Here, accepting Sloan's allegations as true and drawing all reasonable inferences in her favor, Dukes's conduct falls within the clearly established prohibition described above. Whether the restrictions instead rested on circumstances supporting a reasonable disease prevention justification must await further factual development. Accordingly, Dukes's motion to dismiss Sloan's equal protection claim against him on qualified immunity grounds is **DENIED**, and he may renew the defense following discovery.

*ii. Eighth Amendment (Counts VII, VIII, XI, and XII)*

Sloan contends that Dukes and Collins violated her rights under the Eighth Amendment by "den[ying] [her] HIV medication" and "plac[ing] [her] in danger because of the unwarranted disclosure of her HIV status to the other inmates . . . that resulted in violence being committed upon [her]." [DE 1-1 at 196, 198]. Sloan also alleges that Dukes separately violated her Eighth Amendment rights when he "punished [her] for being a carrier of the virus that causes AIDS by refusing [to let her] use the clippers and the equipment in the gym,"—the refusal of which also "constitute[ed] cruel and unusual punishment." [*Id.* at 196, 198]. Sloan was a pretrial detainee at the time of the events alleged in the Amended Complaint. [DE 1-1 at 172–74]. While the Eighth Amendment provides a convicted inmate the right to be free from cruel and unusual punishment, the Due Process Clause of the Fourteenth Amendment provides the same protections to a pretrial

detainee. *Poynter by & through Fernandez v. Shirley*, No. 25-5188, 2026 WL 2641092, at *2 (6th Cir. Sept. 8, 2026). Therefore, Sloan's Eighth Amendment claims must be dismissed, but the Court will consider whether she has stated a claim under the Fourteenth Amendment. "The Sixth Circuit has historically analyzed Fourteenth Amendment pretrial detainee claims and Eighth Amendment prisoner claims 'under the same rubric.'" *Richmond v. Huq*, 885 F.3d 928, 937 (6th Cir. 2018) (quoting *Villegas v. Metro Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013)); *Poynter*, 2026 WL 2641092, at *2 ("In adopting substantive due process as the constitutional foundation for conditions [of confinement] claims, the Supreme Court tied those claims to the familiar language of the Eighth Amendment, with the crucial inquiry remaining whether those conditions are imposed for the purpose of punishment. So although a claimant invoking the Due Process Clause by definition has not been convicted of a crime (as has a prisoner), that difference has no application to a determination of the [detainee's] rights . . . during confinement." (cleaned up)).

2) Against Dukes (Counts VIII and XII)

The Eighth Amendment prohibits conduct by prison officials which involves the "'unnecessary and wanton infliction of pain.'" *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981)). The deprivation alleged must result in the denial of the "minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347; *see also Wilson v. Yaklich*, 148 F.3d 596, 600–01 (6th Cir. 1998). The Eighth Amendment is only concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." *Rhodes*, 452 U.S. at 348 (citation omitted). Moreover, "[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey*, 832 F.2d at 954.

The Court cannot reasonably infer a violation of the Eighth/Fourteenth Amendment in Sloan's allegations regarding the refusal to let her use clippers and gym equipment (Counts VIII and XII). Her allegations that Dukes punished her for her HIV-positive status by denying her access to gym equipment and clippers do not involve the infliction of pain or the denial of life's necessities. Therefore, the allegations do not state a claim under the Cruel and Unusual Punishments Clause. Nor do the allegations present a deprivation that imposed an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life" as required to state a claim under the Fourteenth Amendment's Due Process Clause. *See Conner*, 515 U.S. at 484. The Amended Complaint, therefore, fails to state a violation of the Eighth/Fourteenth Amendment with regards to Counts VIII and XII against Dukes in his personal capacity. Accordingly, these claims are **DISMISSED**.

3) Against Dukes and Collins (Counts VII and XI)

Sloan alleges in Counts VII and XI that Dukes and Collins violated her Eighth Amendment rights when they denied her adequate medical care and caused violence to be committed upon her by other inmates by disclosing her HIV-positive status. [DE 1-1 at 196, 198]. As discussed, Sloan's claims here should be analyzed under the Fourteenth Amendment because Sloan was a pretrial detainee at the time of the events alleged in the Amended Complaint.

a. <u>Adequate Medical Care (Count VII)</u>

Regarding adequate medical care (Count VII), this Court already disposed of Sloan's claim under the Fourteenth Amendment against Dukes and Collins in their individual capacities. These claims are for all intents and purposes identical, and therefore also fail because Sloan has not alleged how Dukes and/or Collins's inaction in her case was "intentional (not accidental)" or done "recklessly." *Poynter*, 2026 WL 2641092 at *4 (quoting *Brawner*, 14 F.4th at 597).

b. Failure to Protect[17] (Count XI)

Under Count XI, Sloan alleges that Dukes and Collins "placed [her] in danger" through the "unwarranted disclosure of her HIV status to the other inmates." As a result of their actions, Sloan was subjected to "direct acts of violence," "total social ostracism," and "embarrass[ment]." [DE 1-1 at 198]. Read with Sloan's allegation that her deprivations resulted from Dukes and Collins's "deliberate indifference" to her right to be free from "cruel and unusual punishment," [DE 1-1 at 189–90], the Court will construe Sloan's claim as one "implicat[ing] the legal rules that apply to claims that jail staff violated the Due Process Clause by failing to protect pretrial detainees from harm." *Lawler as next friend of Lawler v. Hardeman Cnty., Tennessee*, 93 F.4th 919, 926 (6th Cir. 2024). "These types of claims can arise in a variety of circumstances," like for instance, when "a correctional officer might fail to protect the detainee from violence by other inmates." *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 830 (1994)). Because Count XI alleges that Dukes and Collins exposed Sloan to violence and other harm from fellow inmates by disclosing her HIV-positive status, the Court construes it as a failure to protect claim.[18]

Pretrial detainees like Sloan are offered protections by the Fourteenth Amendment's Due Process Clause "that at least match those afforded convicted prisoners under the Eighth Amendment." *Lawler*, 93 F.4th at 926 (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 849–50 (1998)). In order for a prisoner to state an Eighth (or Fourteenth) Amendment claim for

[17] The Court will again consider Sloan's Eighth Amendment claims under the Fourteenth Amendment because she was a pretrial detainee.
[18] To the extent Sloan alleges an "unwarranted disclosure" of private information here, the Court does not construe that allegation as asserting an independent constitutional claim under the Eighth (or Fourteenth) Amendment. Rather, because Sloan directly raises a Fourteenth Amendment privacy claim based on that alleged disclosure (Count XIII), the Court will refrain from considering it here.

deliberate indifference to her safety, she must satisfy both an objective and subjective component.[19] *Farmer*, 511 U.S. at 834; *Helling v. McKinney*, 509 U.S. 25, 35 (1993) (applying deliberate indifference standard to conditions of confinement claims). The objective component requires Plaintiff to allege that she was incarcerated under conditions posing a substantial risk of serious harm. *Lawler*, 93 F.4th at 928. For the subjective component, Plaintiff must also allege that a prison official "acted with 'deliberate indifference' to inmate health or safety," *id.* at 926 (quoting *Farmer*, 511 U.S. at 834), meaning that the official "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. "The requirement that the official have subjectively perceived a risk of harm and then disregarded it is meant to prevent the constitutionalization of [tort] claims; thus, a plaintiff alleging deliberate indifference must show more than negligence." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Farmer*, 511 U.S. at 835. "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot . . . be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838.

Starting with Defendant Collins, even if Sloan could establish the objective component, she has not alleged that Collins knew of and disregarded an excessive risk to her health or safety. As noted earlier, Sloan does not allege any facts from which the Court could infer that Collins had any knowledge of her HIV-positive status, or that he was in any way involved in the disclosure.

---

[19] Since this action was briefed, the Sixth Circuit, sitting en banc, clarified the standard governing Fourteenth Amendment deliberate-indifference claims. *See Poynter by & through Fernandez v. Shirley*, No. 25-5188, 2026 WL 2641092, at *6–8 (6th Cir. Sept. 8, 2026) (en banc). *Poynter*, itself a failure-to-protect case, held that *Farmer*'s subjective deliberate-indifference standard governs conditions of confinement claims brought by detainees who have not been convicted of a crime, rejecting the objective framework that had developed under *Brawner v. Scott County*, 14 F.4th 585 (6th Cir. 2021), and *Westmoreland v. Butler County*, 29 F.4th 721 (6th Cir. 2022). *Poynter*, 2026 WL 2641092, at *6–8. Because the Court applies *Farmer*'s subjective standard here, *Poynter* does not alter the Court's analysis but further confirms that *Farmer* supplies the governing standard.

Nor does Sloan allege that Collins knew about the conditions in her dormitory—as she is only alleged to have informed unidentified members of "LMDC[] staff." [DE 1-1 at 177]. Sloan does allege that Collins "owed [her] a duty of care to take steps to prevent the harm caused to [her]" and that her injuries were "a direct and proximate result of the said acts, [and] indifference . . . of [Collins]." [DE 1-1 at 195]. Even if true, Sloan's allegations against Collins show no more than negligence on his part, which is not sufficient to state an Eighth (or Fourteenth) Amendment claim. *Farmer*, 511 U.S. at 838. Therefore, Sloan's claim (Count XI) against Collins will be **DISMISSED** for failure to state a claim upon which relief may be granted.

Dukes stands in a different position. Sloan alleges that he disclosed her HIV-positive status to other inmates, exposing her to threats and mistreatment from those inmates. [DE 1-1 at 175–76]. Those allegations satisfy the objective component at this stage. *Lawler*, 93 F.4th at 928. Disclosure of an inmate's HIV-positive status can expose her to a substantial risk of serious harm from other inmates. *See Powell v. Schriver*, 175 F.3d 107, 115 (2d Cir. 1999) ("[I]t was as obvious in 1991 as it is now that under certain circumstances the disclosure of an inmate's HIV-positive status . . . could place that inmate in harm's way."). They also plausibly support the subjective component. Unlike Collins, Dukes allegedly created the risk himself by disclosing Sloan's status to the inmates who later threatened and mistreated her. [DE 1-1 at 175–76]. Although Sloan does not allege that Dukes learned what happened afterward, the Court may infer from the circumstances of his disclosure that he recognized the danger it posed when he made it. *See Farmer*, 511 U.S. at 842 ("Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." (citation omitted)); *Powell*, 175 F.3d at 115

(recognizing danger that disclosure of an inmate's HIV-positive status can create). Sloan therefore plausibly alleges that Dukes knew of and disregarded a substantial risk to her safety. *See also Wright v. Chambers-Smith*, No. 3:24-CV-226, 2025 WL 696795, at *9–10 (N.D. Ohio Mar. 4, 2025) (denying dismissal of failure to protect claim where officer allegedly exposed prisoner in protective custody to another inmate by unlocking his cell). Sloan therefore plausibly alleges that Dukes knowingly exposed her to a substantial risk of harm. Accordingly, Dukes's motion to dismiss the failure to protect claim (Count XI) is **DENIED**.

*iii. Count II (Eighth/Fourteenth Amendment)*

Under Count II, Sloan alleges that Dukes and Collins acted with "deliberate indifference" to her Eighth and Fourteenth Amendment rights, and she suffered a list of constitutional deprivations as a result. [DE 1-1 at 190]. Dukes and Collins assert that Count II's "allegations are either not sufficiently supported by factual allegations or are duplicative of other claims asserted elsewhere in the [operative] [c]omplaint," [DE 17 at 737], and that in any event—they are entitled to qualified immunity. [*Id.* at 735]. Sloan responds that "[w]hile some of the rights alleged in Count II overlap with those in other counts, the Amended Complaint is entitled to plead alternative theories of recovery," [DE 20 at 775], and that her "allegations are supported by the specific factual allegations detailed throughout the Amended Complaint and in [her] Response." [*Id.*].[20]

---

[20] In her Response to Moving Defendants' Motion to Dismiss, Sloan attaches a new report in support of her claims. "As a general rule, a court considering a motion to dismiss 'must focus only on the allegations in the pleadings.'" *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 979 F.3d 426, 440 (6th Cir. 2020) (quoting *Bates v. Green Farms Condo. Ass'n*, 958 F.3d 470, 483 (6th Cir. 2020)). "This does not include [a plaintiff's] response[ ] to a motion to dismiss." *Id.* A plaintiff "cannot 'amend [her] complaint in an opposition brief or ask the court to consider new allegations (or evidence) not contained in the complaint.'" *Id.* "If a complaint fails to state a claim even under the liberal requirements of the federal rules, the plaintiff cannot cure the deficiency by inserting the missing allegations in a document that is not either a complaint or an amendment to a complaint." *Bates*, 958 F.3d at 484 (quoting *Harrell v. United States*, 13 F.3d 232, 236 (7th Cir. 1993)). The Court, therefore, will not consider Sloan's new evidence here.

"Courts have 'the inherent power to manage [their] docket[s].'" *Bureau of Consumer Fin. Prot. v. Fifth Third Bank, N.A.*, No. 1:21-CV-262, 2023 WL 7325956, at 12 (S.D. Ohio Sept. 26, 2023) (quoting *In re Prevot*, 59 F.3d 556, 566 (6th Cir. 1995)). "This power includes the ability to dismiss duplicative claims raised in the same case," and "[e]xercising that power falls within the court's sound discretion." *Id.*; *Grundy v. FCA US LLC*, No. 2:20-cv-11231, 2020 WL 7353515, at *3 (E.D. Mich. Dec. 15, 2020) ("Although courts may dismiss duplicative claims in the same case, they need not do so." (cleaned up)). "At the same time, the Federal Rules expressly permit a party to plead in the alternative. Fed. R. Civ. P. 8(d)(2)." *Fifth Third Bank*, 2023 WL 7325956, at 12. "Accordingly, a court normally will not dismiss duplicative claims if they can reasonably be understood to plead alternative theories of relief." *Id.* (declining to dismiss counts as duplicative when they could "be fairly read as pleading in the alternative because the various counts describe slightly different challenged conduct and proceed under slightly different statutory authority"). It is appropriate for a court to dismiss truly duplicative claims as it does not prejudice a plaintiff. *See Moran v. Ruan Logistics*, No. 1:18-CV-223, 2018 WL 4491376, at *3 (S.D. Ohio Sept. 19, 2018); *BAC Home Loans Servicing LP v. Fall Oaks Farm LLC*, 2012 WL 3283397, at *3 (S.D. Ohio Aug. 10, 2012); *Smith v. Bd. of Trustees Lakeland Cmty. Coll.*, 746 F.Supp.2d 877, 899 (N.D. Ohio 2010) ("it is axiomatic that [plaintiff] cannot assert two separate counts alleging the exact same claims" (citing *Mohr v. Chicago Sch. Reform Bd. of Trustees of the Bd. of Educ.*, 993 F.Supp. 1155, 1157 (N.D. Ill. 1998))); *Foster v. City of Southfield*, 1996 WL 742291, at *6 (6th Cir. Dec. 20, 1996) ("It was not error for the District Court to conclude that submitting both claims to the jury would be duplicative and potentially confusing to the jury.").

The Court agrees that some of Sloan's Count II is duplicative and not merely pleading in the alternative because it describes the same challenged conduct and proceeds under the same

statutory and constitutional authority as other counts. *Fifth Third Bank*, 2023 WL 7325956, at 12. Specifically, Sloan's Count II raises a myriad of constitutional violations under the Eighth and Fourteenth Amendments, some of which have already been addressed by this Court under separate counts. She alleges that Dukes and Collins showed "deliberate indifference" to her right to privacy, personal integrity, and substantive and procedural due process; as well as her right to be free from "unwanted and unreasonable" disclosure of her HIV status, physical contact, improper and unreasonable searches and seizures, unwanted intrusion upon her person, physical assault and battery, excessive force, unwanted humiliation, and cruel and unusual punishment. [DE 189–90]. The Court will take each of these in order.

Start with Sloan's allegation in Count II that Dukes and Collins showed "deliberate indifference to [her] right to privacy" under the Eighth and Fourteenth Amendments.[21] Sloan challenged the same conduct, under the same standard, in Count XIII against Dukes. There, the Court already held that Dukes is not entitled to qualified immunity for Sloan's Fourteenth Amendment substantive due process privacy claim against him and her claim may proceed. Therefore, Sloan is not prejudiced by the Court dismissing Count II to the extent that it alleges the same. That leaves her privacy claim against Collins. The Court has already held that Sloan failed to sufficiently allege that Collins was involved in the disclosure of her HIV-positive status under Count XI. Thus, Sloan is similarly not prejudiced by the Court dismissing Count II to the extent that it alleges the same.

Sloan's other allegations regarding physical contact, improper and unreasonable searches and seizures, unwanted intrusion upon her person, physical assault and battery, and excessive force

[21] Sloan's Fourteenth Amendment substantive due process claim against Dukes and Collins implicating her right to privacy was directly tied throughout her Amended Complaint to the "unwanted and unreasonable" disclosure of her HIV status and the "unwanted humiliation" she experienced because of it. [DE 1-1 at 189–90]. As such, the Court will consolidate these allegations under the "right to privacy" for ease of analysis.

are not necessarily duplicative. Count II raises these under the Eighth and Fourteenth Amendments and against Dukes and Collins in their individual capacities, whereas Sloan's other Counts implicating this alleged conduct are brought via *Monell* failure to train and supervise claims against LJCMG and Collins. Even so, Moving Defendants correctly note that these claims "are not sufficiently supported by factual allegations." [DE 17 at 737]. Sloan's sole factual allegation lending support to these claims is her statement that "[she] was physically beaten" by unspecified individual(s), at an unspecified time while in LMDC. [DE 1-1 at 190]. Sloan does not identify any further factual support for these allegations, nor can the Court locate any on its own. A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). Here, Sloan's lack of factual content tying an alleged beating (or other physical contact) to Dukes and/or Collins leaves her Amended Complaint on its face not plausible. *Id.* Accordingly, Count II to the extent that it alleges physical contact, improper and unreasonable searches and seizures, unwanted intrusion upon her person, physical assault and battery, and excessive force must be dismissed.

Lastly, Sloan alleges in Count II that Dukes and Collins showed "deliberate indifference" to her right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments. But Sloan already raised several Eighth/Fourteenth Amendment claims against them in their individual capacities related to use of gym resources, inadequate medical care, and failure to protect her from other inmates.[22] And to the extent the Court has permitted any of these claims

[22] Sloan did not specify under Count II how Collins and Dukes showed "deliberate indifference" to her right to be free from cruel and unusual punishment. [DE 1-1 at 189–90]. Thus, the Court assumes that she is referring to the same conduct alleged against Dukes and Collins that undergird her other Eighth/Fourteenth Amendment claims against them.

to proceed, they remain pending under other counts of the Amended Complaint. Thus, Sloan is not prejudiced by the Court dismissing Count II to the extent that it alleges the same.

Accordingly, Sloan's claims against Dukes and Collins under Count II are **DISMISSED**.

c. Qualified Immunity on State Law Claims

Collins and Dukes argue that both of Sloan's state-law negligence claims against them should be dismissed because of qualified immunity. [DE 17 at 724–25].

Under Kentucky law, *Yanero v. Davis*, 65 S.W.3d 510 (Ky. 2001), "provides the framework for deciding whether a public officer or employee is afforded immunity from tort liability." *Ritchie v. Turner*, 559 S.W.3d 822, 831 (Ky. 2018). Qualified immunity applies to the negligent performance of "(1) discretionary acts or functions, i.e., those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment; (2) in good faith; and (3) within the scope of the employee's authority." *Yanero*, 65 S.W.3d at 522 (citations omitted). However, it does not apply to "the negligent performance of a ministerial act, i.e., one that requires only obedience to the orders of others, or when the officer's duty is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts." *Id.* (citation omitted). Acts involving supervision and training are consistently held to be discretionary functions. *See, e.g.*, *Nichols v. Bourbon Cnty. Sheriff's Dep't*, 26 F. Supp. 3d 634, 642 (E.D. Ky. 2014); *Doe v. Magoffin Cnty. Fiscal Ct.*, 174 F. App'x 962, 973 (6th Cir. 2006); *Rowan Cnty. v. Sloas*, 201 S.W.3d 469, 480 (Ky. 2006).

Whether qualified immunity shields individuals from suit under Kentucky law depends on whether their acts of supervision and training were performed in good or bad faith. *See Nichols*, 26 F. Supp. 3d at 642. "[G]ood faith is just a presumption that exists absent evidence of 'bad faith.'" *Sloas*, 201 S.W.3d at 475. Bad faith "can be predicated on a violation of a constitutional,

statutory, or other clearly established right which a person in the public employee's position presumptively would have known was afforded to a person in the plaintiff's position, i.e., objective unreasonableness; or if the officer or employee willfully or maliciously intended to harm the plaintiff or acted with a corrupt motive." *Yanero*, 65 S.W.3d at 523.

*i. Count IV – Negligent Supervision and Training*

In her Amended Complaint, Sloan alleges that Collins acted with "deliberate indifference to [her] right to privacy" and "to substantive and procedural due process," as well as her rights "to be free from unwanted and unreasonable disclosure of her HIV status, . . . improper and unreasonable searches and seizures, . . . physical assault and battery, . . . excessive force, . . . unwanted humiliation, . . . [and] cruel and unusual punishment"—by failing to properly supervise and train Dukes. [DE 1-1 at 189–90]. It states that Collins "had a duty to exercise reasonable care in the hiring, retention, and supervision of individuals" and "breached his duty in the negligent and reckless supervision and training of [Dukes]." [*Id.* at 193]. She also specifically alleges that Collins "knew, or in the exercise of ordinary care should have known, of the incompetence, unfitness, and dangerous characteristics of [Dukes]." [*Id.*]. Collins specifically disputes this allegation. [DE 17 at 725] ("[T]he Amended Complaint is devoid of any factual allegations representing that [Collins] knew or reasonably should have known that any of his subordinates would violate plaintiff's rights." (internal quotation marks omitted)).

At this early stage in the litigation, taken as true, these are sufficient facts to allege bad faith. *Sloas*, 201 S.W.3d at 485–86 ("If an officer 'knew or reasonably should have known that the action he took would violate a [clearly established] right of the plaintiff,' bad faith may be found to exist." (quoting *Yanero*, 65 S.W.3d at 523)); *see Anderson v. Knox Cnty.*, No. CV 6:17-133-KKC, 2018 WL 7500205, at *15 (E.D. Ky. Oct. 3, 2018) (denying motion to dismiss based on

qualified immunity where plaintiff alleged that law enforcement defendants "failed to properly train and supervise their subordinates, despite their duty to do so . . . failed to provide adequate policies to prevent the fabrication of evidence and the suppression of exculpatory evidence" and that these failures "were grossly negligent, and resulted in the deprivation of [plaintiff's] constitutional rights"). Accordingly, Collins's motion to dismiss the negligent supervision and training claim (Count IV) is **DENIED**.

*ii. Count V – Ordinary and/or Gross Negligence*

Sloan asserts that Collins and Dukes were negligent and/or grossly negligent by failing to "prevent the harm caused to [her]" as outlined in her Amended Complaint. [DE 1-1 at 194]. Collins and Dukes contend that they are entitled to qualified official immunity on these claims, primarily because Sloan fails to assert bad faith. [DE 17 at 725–26].

1) Collins

Collins makes the same argument to dismiss this count as he did under Count IV: "[He] . . . can[not] be said to have possessed any reason to know that [Sloan] was at such risk of harm." [DE 17 at 726]. Sloan makes similar arguments as well. [DE 1-1 at 194] ("[Collins] owed a duty of care to hire, train, and supervise his subordinates" and "owed [Sloan] a duty of care to take steps to prevent the harm caused to [her] . . . as stated herein this Amended Complaint."). Because the underlying factual allegations and bad-faith standard are the same as those considered under Count IV, the Court **DENIES** Collins's motion to dismiss the ordinary/gross negligence claim (Count V) for the reasons stated above.

2) Dukes

Sloan alleges that Dukes "owed [her] a duty of care . . . to follow the proper law enforcement policies, correctional enforcement policies, procedures, and techniques" and that he

"breached this duty of care by . . . failing to act as reasonable law enforcement officers or correctional law enforcement officer would and should have under the same or similar circumstances." [DE 1-1 at 194]. Though not explicitly stated, the Court reads these "circumstances" to concern Dukes's alleged disclosure of Sloan's HIV-positive status to other inmates and prevention of Sloan from using gym equipment. [DE 1-1 at 196, 197–99]. Elsewhere in her Amended Complaint, Sloan ties this alleged conduct to her race and HIV-positive status. [DE 1-1 at 181–82] ("Sloan was singled out by Officer Dukes because of her race . . . [and] HIV status."). Whether Dukes performed these acts and whether he did so in good or bad faith is a question of fact. *See Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016) ("[I]f the qualified immunity questions presented are fact-intensive, the record may not be adequately developed to evaluate the defense at the pleading stage under Rule 12(b)(6)."). Taking Sloan's factual allegations as true and drawing all inferences in her favor, qualified immunity cannot be determined at this stage of the proceedings. As a result, Dukes' motion to dismiss the ordinary/gross negligence claim (Count V) is also **DENIED**.

d. Other Issues

*i. Statute of Limitations*

Moving Defendants also argue that, to the extent Sloan seeks relief for conduct during her confinement at LMDC in late 2023, those claims are time-barred. [DE 17 at 738–39]. This argument concerns only the Amended Complaint's allegations of conduct in 2023, rather than the conduct occurring in 2024 that forms the basis of the Court's analysis *supra*. Sloan counters that the continuing violation doctrine permits her to pursue relief for the 2023 conduct too. [DE 20 at 783].

Because § 1983 does not provide a statute of limitations, federal courts borrow the forum state's statute of limitations for personal injury actions. *Wilson v. Garcia*, 471 U.S. 261, 275–80 (1985). Thus, in Kentucky, § 1983 actions are limited by the one-year statute of limitations found in Ky. Rev. Stat. § 413.140(1)(a). *Collard v. Ky. Bd. of Nursing*, 896 F.2d 179, 182 (6th Cir. 1990). Although state law establishes the statute of limitations for § 1983 actions, federal law controls on the issue of when the statute of limitations begins to run. *Sevier v. Turner*, 742 F.2d 262, 272 (6th Cir. 1984). Federal law establishes that the § 1983 statute of limitations accrues when the plaintiff knew or should have known of the injury that forms the basis of the claim alleged in the complaint. *Ruff v. Runyon*, 258 F.3d 498, 500 (6th Cir. 2001). Here, Sloan alleges that she was not receiving her HIV medication while in LMDC custody in late 2023 despite repeatedly asking LMDC personnel for treatment. [DE 1-1 at 170–71]. She knew or should have known of that deprivation at the time, and the one-year limitations period therefore expired no later than December 2024. [*Id.*]. Because she did not bring this action until April 2025, her claims arising from that conduct are untimely unless the continuing violation doctrine applies.

Sloan invokes that doctrine to argue that the 2023 conduct remains actionable. [DE 20 at 738]. The continuing violation doctrine "allows the court to[] consider as timely all relevant violations including those that would otherwise be time [-]barred." *Bruce v. Corr. Med. Serv.*, 389 F. App'x 462, 466 (6th Cir. 2010) (cleaned up) (quoting *Nat'l Parks Conservation Ass'n. Inc. v. Tenn. Valley Auth.*, 480 F.3d 410, 419 (6th Cir. 2007)). However, it is a narrow exception to ordinary limitations rules and is rarely applied in § 1983 cases. *See Sharpe v. Cureton*, 319 F.3d 259, 267 (6th Cir. 2003); *Arya v. Taxak*, 3:17-CV-032-TBR, 2017 WL 5560411, at *11 n.13 (W.D. Ky. Nov. 17, 2017).

The Sixth Circuit recognizes two categories of continuing violations. *Brown v. Louisville-Jefferson Cnty. Metro Gov't*, 135 F.4th 1022, 1034–35 (6th Cir. 2025). Under the first, a plaintiff must allege: wrongful conduct continuing after the event that began the pattern, injury continuing to accrue after that event, and further injury that could have been avoided had the defendants ceased their wrongful conduct. *Id.* at 1035. Continuing "ill effects" of an earlier violation and passive inaction do not satisfy this standard. *Id.* Instead, the plaintiff must allege "continual unlawful acts." *Id.* (quoting *Tolbert v. Ohio Dep't of Transp.*, 172 F.3d 934, 940 (6th Cir. 1999)). The second category concerns distinct acts whose cumulative effect amounts to a constitutional violation. *Id.* But where those acts are individually actionable, the doctrine does not apply. *See id.* (rejecting a continuing violation theory where plaintiff's malicious prosecution claim arose from a discrete, independently actionable prosecution, even though same officers and prosecutors were involved in an earlier prosecution). A plaintiff may also establish a continuing violation by alleging a longstanding and demonstrable policy of discrimination under which intentional discrimination against her class was the defendants' "standing operating procedure." *Huang v. Presbyterian Church (U.S.A.)*, 346 F. Supp. 3d 961, 976 (E.D. Ky. 2018) (quoting *Basista Holdings, LLC v. Ellsworth Twp.*, 710 F. App'x 688, 693 (6th Cir. 2017)).

In the context of a failure to provide adequate medical care, related but discrete denials of treatment do not become a continuing violation merely because they concern the same medical condition. *Bruce*, 389 F. App'x at 466–67. Accordingly, any specific instance in which a plaintiff requested but was denied necessary medical care could constitute a discrete act that placed the plaintiff on notice of the deprivation of her rights. *Moore v. Hopkins Cnty., Ky.*, No. 4:17CV-00039-JHM, 2017 WL 3097530, at *5 (W.D. Ky. July 20, 2017). In *Bruce*, for example, the plaintiff alleged that, while in prison custody, he was expressly denied necessary knee surgery for almost

five years, ultimately causing him to require a full knee replacement and suffer permanent impairment. 389 F. App'x at 463–64. Despite the prolonged denial of treatment during his incarceration, the Sixth Circuit rejected application of the continuing violation doctrine, explaining that the provider's refusals to provide medical care "represent discrete unlawful acts" that independently "trigger[ed] the statute of limitations." *Id.* at 466–67. Accordingly, only those refusals occurring within the limitations period were potentially actionable. *Id.* at 467. The court explained that, to the extent the provider's continued failure to furnish treatment amounted to passive inaction rather than an affirmative refusal of care, that inaction likewise did not support a continuing violation theory. *Id.* at 466–67 (citing *Eidson v. Tenn. Dept. of Children's Servs.*, 510 F.3d 631, 635 (6th Cir. 2007)).

Here, Sloan alleges that officials failed to provide necessary HIV treatment while she was in LMDC custody in late 2023 and again beginning in April 2024. [DE 1-1 at 169–71, 172–75]. Those allegations do not establish a continuing violation under either category identified in *Brown*. As to the first, Sloan describes officials' continued failure to act on her requests for medication in late 2023, rather than express refusals to provide it. [*See id.* at 171 ("Although from November 29, 2023, to up and until at least December 19, 2023, the LMDC staff was informed of Ms. Sloan's HIV positive status and the necessity for her HIV medications, however nobody from LMDC provided Ms. Sloan with her HIV medication.")]. Although the resulting deprivation persisted, passive inaction does not constitute the continual unlawful acts necessary to invoke the doctrine. *Brown*, 135 F.4th at 1035; *Bruce*, 389 F. App'x at 466–67. Nor do the alleged failures to provide treatment in 2023 and 2024, without more, plausibly establish that intentional discrimination against persons with HIV was a longstanding and demonstrable policy or standing operating procedure at LMDC. *Huang*, 346 F. Supp. 3d at 976.

The second category likewise does not preserve Sloan's claims. To the extent the alleged failures to provide medication constitute distinct denials of necessary medical care, each was independently actionable once Sloan knew or had reason to know of the resulting injury. *Bruce*, 389 F. App'x at 466–67; *Moore*, 2017 WL 3097530, at *5. Their cumulative effect therefore does not bring them within the second category. *Brown*, 135 F.4th at 1035. Accordingly, the alleged failures to provide medication in 2024 do not render the claims arising from the 2023 conduct timely. Moving Defendants' motion is therefore **GRANTED** as to Sloan's claims arising from the alleged deprivation of medical treatment in late 2023. This conclusion does not affect the claims arising from the 2024 conduct analyzed *supra*.

*ii. Punitive Damages*

Sloan seeks punitive damages from Moving Defendants. [DE 1-1 at 182]. Moving Defendants respond that she cannot recover punitive damages from LJCMG and that to the extent she is attempting to do so, those claims must be dismissed. [DE 17 at 738]. Sloan does not contest that LJCMG "is immune from punitive damages," but still seeks punitive damages against Collins and Dukes. [DE 20 at 782]. Accordingly, Moving Defendants' motion is **GRANTED** as to Sloan's request for punitive damages against LJCMG. Her requests for punitive damages against Collins and Dukes remain unchallenged and may proceed in connection with her surviving claims against them.

## III. CONCLUSION

For the reasons set forth above, and the Court being otherwise sufficiently advised, it is hereby **ORDERED** as follows:

(1) Defendant LJCMG's motion to dismiss Sloan's Amended Complaint (DE 1-1) is **GRANTED** in part and **DENIED** in part. The motion is **GRANTED** as to Sloan's

request for punitive damages against LJCMG. It is **DENIED** as to Counts I, III, VI, VII, and XI. Counts I, III, VI, VII, and XI will proceed against LJCMG.

(2) Defendant Dukes and Defendant Collins's motion to dismiss is **GRANTED** in part and **DENIED** in part. Counts II, and VII are **DISMISSED** as to these defendants. Counts VIII, X, and XII are **DISMISSED** as to Dukes, and Count XI is **DISMISSED** as to Collins. Counts III, IV, V, and VI will proceed against Collins in his personal capacity, and Counts IX, XIII, V, VI, and XI will proceed against Dukes in his personal capacity.

(3) Moving Defendants' motion to dismiss Sloan's request for punitive damages is **GRANTED** as to LJCMG.

(4) Moving Defendants' 12(b)(5) Motion is **DENIED** as to all parties.

(5) Moving Defendants' motion to dismiss Sloan's 2023 claims as time-barred is also **GRANTED** as to all parties.

(6) The Court will direct the Clerk of Court to re-docket DE 1-1, at PageIDs 161 to 200, as the operative Amended Complaint in this case.

Rebecca Grady Jennings, District Judge
United States District Court

November 18, 2026